No. 103,842

State of Kansas, *Appellee*, v. George Lowell Brown II, *Appellant*.

(284 P.3d 977)

Opinion filed August 24, 2012.

*Lydia Krebs*, of Kansas Appellate Defender Office, argued the cause and was on the brief for appellant.

*James R. Spring*, deputy county attorney, argued the cause, and *Steve Six*, attorney general, was with him on the brief for appellee.

The opinion of the court was delivered by

LUCKERT, J.: In past decisions, this court has applied a super-sufficiency requirement for evidence in alternative means cases. When a single criminal offense may be committed by alternative means, jury unanimity is not required as to the means by which the crime was committed, as long as substantial evidence supports each alternative means set out in the jury instructions. If the evidence is insufficient on one or more of the means on which the jury has been instructed, the conviction must be reversed.

Defendant George L. Brown II's first issue on appeal requires us to consider specifically for the first time the starting point of an alternative means analysis: When does a statute—and thus a jury instruction employing its language—set out alternative means to commit a crime?

We hold that a statute—and any instruction that incorporates it—must list distinct alternatives for a material element of the crime, not merely describe a material element or a factual circumstance that would prove the crime, in order to qualify for an alternative means analysis and application of the super-sufficiency requirement. This holding leads us to conclude that Brown's jury was

not presented with alternative means on the aggravated indecent liberties or the lewd and lascivious behavior charges against him in this case.

In his second issue, Brown argues the trial court erred in allowing the State to reopen its case-in-chief to present evidence of his age. We reject this argument because the trial court did not abuse its discretion in granting the State's request; as the trial court determined, the additional evidence could assist the jury in determining Brown's guilt of the off-grid crime of aggravated indecent liberties with a child, and the timing of the additional evidence did not cause legal prejudice.

We also reject Brown's third argument that the prosecutor committed reversible misconduct during jury selection and closing argument; while we find the prosecutor committed misconduct, the misconduct was harmless.

As to Brown's fourth issue, we agree with Brown's argument that the trial court erred in imposing lifetime postrelease supervision and, consequently, we vacate this portion of his sentence. Finally, we reaffirm the long line of cases holding that the use of a defendant's prior criminal history is not contrary to the right to a jury trial.

Ultimately, we affirm Brown's convictions, vacate the imposition of lifetime postrelease supervision and otherwise affirm his sentence, and remand the case with directions.

## FACTS AND PROCEDURAL BACKGROUND

A jury found Brown guilty of one count of aggravated indecent liberties with a child under the age of 14 and one count of lewd and lascivious behavior in the presence of a person under the age of 16. These convictions were related to conduct that occurred during the weekend of April 17, 2009, to April 19, 2009, when an 8-year-old girl, G.V., stayed with Brown.

Brown worked with G.V.'s father and was a friend of G.V.'s family. Before that weekend, G.V.'s family had visited Brown's house for social visits or to see his horses, and G.V. had spent the night at Brown's house, without her parents, 5 to 10 times. G.V.'s mother testified that usually it was G.V. who wanted to go to Brown's

house, but a couple of times Brown asked if G.V. could come out to his house. After spending the April weekend with Brown, G.V. told her parents that Brown had been touching her in inappropriate places.

G.V. testified at trial that when she stayed at Brown's house, she would sleep in Brown's bed with him. Neither G.V. nor Brown wore any clothes while they slept in the bed. G.V. testified that Brown would "snuggle" with her and would touch her "[i]n the privates," which G.V. also called her "middle." Brown would also rub lotion all over G.V.'s body, including her "middle" and chest. G.V. testified that she had seen Brown naked before and that he had shown her his "privates." She also stated that Brown would get on top of her while both of them were naked. On cross-examination, G.V. stated that she slept naked because Brown had a waterbed and she would get hot if she wore her nightgown.

G.V. also testified that Brown bought her an apron, which she wore without any other clothes while making eggs. G.V. stated that it was not her choice to wear the apron and nothing else.

The jury also viewed a video of a police interview of G.V. In the interview, beyond detailing the same events described in her testimony, G.V. also stated that Brown's mouth and hands would touch her "boobies" and that he would lick her "boobies." G.V. also stated that Brown would make G.V. get on top of him while they were both naked and he would kiss her on the lips.

The interviewing officer, Christina McDonald, testified at trial that by using anatomical dolls, G.V. indicated that Brown rubbed lotion on her "boobies" and "middle." In addition, Officer McDonald testified regarding the execution of a search warrant at Brown's residence that resulted in officers finding five bottles of lotion on the headboard of Brown's bed, a photograph of G.V. on Brown's desk, and a child-size, red and white apron. These items were admitted at trial.

Officer McDonald also interviewed Brown after executing the search warrant. A video of the interview was played for the jury. Brown generally denied any touching of G.V., although he admitted the two of them slept naked in his bed because of the heated waterbed. He also admitted to scratching G.V.'s back and to rub-

bing lotion on G.V. when she asked; he added that this was something "she just loved."

After the State rested, Brown presented no evidence. The trial court excused the jury for the day, stating, "All the evidence that is going to be presented has been presented." Brown then moved for judgment of acquittal, although he did not support the motion with any arguments. The trial court denied the motion and immediately conducted the jury instruction conference. At the conference, the court proposed an instruction relating to the elements of aggravated indecent liberties with a child that stated in part that the State must prove "[t]hat at the time of the act the defendant was 18 years of age or older."

When the trial reconvened the next morning, outside the presence of the jury, the State sought to reopen its case. As will be discussed in more detail, the trial court granted the State's oral motion, and the State then called Officer McDonald and asked one substantive question, "What is [Brown's] date of birth?" Defense counsel did not cross-examine Officer McDonald and chose not to present any additional evidence.

After considering the evidence, the jury found Brown guilty of one count of aggravated indecent liberties with a child under the age of 14 in violation of K.S.A. 21-3504(a)(3)(A), an off-grid person felony, and one count of lewd and lascivious behavior in the presence of a person under 16 years of age in violation of K.S.A. 21-3508(a)(2), a severity level 9 person felony. The trial court sentenced Brown to life imprisonment with a mandatory minimum term of not less than 25 years for the aggravated indecent liberties conviction and to a concurrent sentence of 12 months' probation with an underlying term of 12 months' imprisonment for the lewd and lascivious behavior conviction. Although not announced at the sentencing hearing, the journal entry indicated the court also imposed a term of lifetime postrelease supervision for the aggravated indecent liberties conviction.

Brown filed a timely notice of appeal. This court has jurisdiction under K.S.A. 22-3601(b) (maximum sentence of life imprisonment imposed; appeal docketed prior to July 1, 2011).

## ALTERNATIVE MEANS

In his first issue on appeal, Brown argues both of his convictions must be reversed because the evidence was insufficient to support a finding of guilt on each of the various alternative means for committing the two crimes on which the jury was instructed. Brown's argument rests on the alternative means rule stated by this court in *State v. Timley*, 255 Kan. 286, 875 P.2d 242 (1994).

In *Timley*, the court established what we have referred to as the alternative means rule and its corollary super-sufficiency requirement when it held: " '[W]here a single offense may be committed in more than one way, there must be jury unanimity as to *guilt* for the single crime charged. Unanimity is not required, however, as to the *means* by which the crime was committed so long as substantial evidence supports each alternative means.' " *Timley*, 255 Kan. at 289-90 (quoting *State v. Kitchen*, 110 Wash. 2d 403, 410, 756 P.2d 105 [1988]); see *State v. Wilson*, 220 Kan. 341, 345, 552 P.2d 931 (1976) (recognizing premeditated and felony murder as alternative theories of first-degree murder; upholding verdict because it "can be justified on either of two interpretations of the evidence"), *disapproved on other grounds by State v. Quick*, 226 Kan. 308, 597 P.2d 1108 (1979). More recently, this court explained that the *Timley* alternative means rule/super-sufficiency requirement "is the only choice to ensure a criminal defendant's statutory entitlement to jury unanimity." *State v. Wright*, 290 Kan. 194, 206, 224 P.3d 1159 (2010).

Citing the super-sufficiency requirement, Brown points to the two jury instructions in his case that identified the elements of the charged crimes and argues that alternatives within the instructions—terms separated by the word "or"—stated alternative means of committing the crimes.

Specifically, regarding his conviction for aggravated indecent liberties with a child, Brown focuses on the portion of the jury instruction that told the jury the State must prove "[t]hat the defendant fondled or touched the person of [G.V.] in a lewd manner, with the intent to arouse or satisfy the sexual desires *of either* [*G.V.*], *or the defendant, or both*." (Emphasis added.) He argues

three alternative means are presented because the intent element—stated as the intent to arouse or satisfy sexual desires—has three potential objects: the victim, the defendant, or both.

Similarly, regarding Brown's second conviction, he focuses on the intent element of the jury instruction on lewd and lascivious behavior, which required the State to prove that Brown "exposed his sex organ in the presence of a person not his spouse and who had not consented thereto, with the intent to arouse or to gratify the sexual desires *of the defendant or another*." (Emphasis added.) Brown argues the italicized language creates two alternative means because of the two potential objects: the defendant or another.

According to Brown, the State's evidence as to both crimes proved only that Brown intended to arouse or satisfy his own sexual desires; it failed to prove that he intended to arouse or satisfy G.V.'s sexual desires or those of another. Thus, Brown maintains, there was not substantial evidence to support each alternative means.

The State, on the other hand, characterizes this as an atypical alternative means case. In part, it argues: "[T]he alternatives are not in what Defendant did (the 'means') that constitutes the offense[s] charged but *why* Defendant did what he did. What was his intent in doing what he did? That there was sufficient evidence to support a unanimous verdict that the physical acts occurred is not being questioned." In addition, at oral argument, the State for the first time asked us to overturn *Wright* and return to the reasoning of *State v. Dixon*, 279 Kan. 563, 604-06, 112 P.3d 883 (2005), which we disapproved in *Wright*. See *Wright*, 290 Kan. at 205-06.

Regarding this last point, we decline the State's invitation to revisit our recent decision in *Wright* based solely on a passing comment made during oral argument because an issue not briefed by the appellant is deemed waived and abandoned. *State v. McCaslin*, 291 Kan. 697, 709, 245 P.3d 1030 (2011). We will more fully discuss the State's other arguments, however, which present issues we have not fully addressed in previous opinions.

*Identifying Alternative Means Crimes*

The first thing that a prosecutor and trial judge must do to try to ensure that an alternative means analysis and its super-suffi-

ciency requirement will not compel reversal of any conviction is to identify whether the criminal statute supporting the charged crime is an alternative means statute. If so, the elements jury instruction incorporating the statute should be tailored to include only those alternative means supported by some evidence.

In this case, there was no tailoring, leaving the question of whether various phrases separated by the word "or" presented alternative means. The State argues the alternatives cannot state alternative means because they relate to the *mens rea* element, not to alternative acts. In contrast, Brown suggests every option provided for in the respective statutes is an alternative means.

- *Mental States—*Mens Rea*—Can Be An Alternative Means*

We first address the State's argument that a statute's inclusion of alternative mental states can *never* give rise to an alternative means issue. In the State's view, a jury instructed on alternative mental states relating to a crime—the proscribed *mens rea*—has not been instructed on an alternative means crime, whereas a jury instructed on alternative acts that constitute the crime—the proscribed *actus reus*—has been instructed on an alternative means crime.

We have never directly addressed this issue, but the United States Supreme Court has done so in *Schad v. Arizona*, 501 U.S. 624, 111 S. Ct. 2491, 115 L. Ed. 2d 555 (1991). In *Schad*, the Court considered whether premeditated murder and felony murder were separate offenses or alternative means of committing the same crime. The Court noted the question "involves a general verdict predicated on the possibility of combining findings of what can best be described as alternative mental states, the one being premeditation, the other the intent required for murder combined with the commission of an independently culpable felony." *Schad*, 501 U.S. at 632. Such a situation was not unlike those in which alternative conduct was alleged, the Court concluded. See *Schad*, 501 U.S. at 631-32. As an example, the Court cited a prior case in which a seaman shot a shipmate and immediately threw the victim into the sea. The seaman was charged in a single count with murder by inflicting a mortal gunshot wound or by drowning. Including

the alternative causes of death in a single count did not make the charge defective because "it was immaterial whether death was caused by one means or the other." *Schad*, 501 U.S. at 631 (discussing *Andersen v. United States*, 170 U.S. 481, 504, 18 S. Ct. 689, 42 L. Ed. 1116 [1898]).

The *Schad* Court noted that in a case where there were alternative theories regarding the act that comprised the crime, "as in litigation generally, 'different jurors may be persuaded by different pieces of evidence, even when they agree upon the bottom line. Plainly there is no general requirement that the jury reach agreement on the preliminary factual issues which underlie the verdict.' " *Schad*, 501 U.S. at 631-32 (quoting *McKoy v. North Carolina*, 494 U.S. 433, 449, 110 S. Ct. 1227, 108 L. Ed. 2d 369 [1990] [Blackmun, J., concurring]). The Court drew a line between facts that are "material" and those that are "immaterial" and defined material facts as those " 'necessary to constitute the crime.' " *Schad*, 501 U.S. at 638 (quoting *In re Winship*, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 [1970]). In the situation of the seaman, the material fact was that the seaman caused the death of the shipmate. The *Schad* Court then concluded there was no reason "why the rule that the jury need not agree as to mere means of satisfying the *actus reus* element of an offense should not apply equally to alternative means of satisfying the element of *mens rea*," that is, to the requisite mental state. *Schad*, 501 U.S. at 632.

Our Kansas caselaw is in line with *Schad*. We have recognized that premeditated murder and felony murder are alternative means of committing first-degree murder, although we have not focused particularly on the inherent underlying premise that alternative means can be based on variations in *mens rea*, as well as in *actus reus*, or in a statutorily required causation element. See, *e.g.*, *State v. Kesselring*, 279 Kan. 671, 679, 112 P.3d 175 (2005); *State v. Morton*, 277 Kan. 575, 579, 86 P.3d 535 (2004); *State v. Hoge*, 276 Kan. 801, 809, 813, 80 P.3d 52 (2003). We therefore reject the State's argument that alternative means can *never* arise out of variations of the *mens rea* element.

- *An "Or" Does Not Necessarily Equal an Alternative Means*

Having rejected the State's absolutist argument, we turn to Brown's contrary absolutist argument that a statute's inclusion of varying mental states *always* signals that alternative means are at issue. We reject this as well.

In past cases, to the extent we have defined the term "alternative means" at all, we have done so only obliquely through one broad sentence borrowed without elaboration or explanation from the Washington Supreme Court: " 'In an alternative means case, . . . a single offense may be committed in more than one way.' " *Timley*, 255 Kan. at 289 (quoting *Kitchen*, 110 Wash. 2d at 410). This sentence, straightforward on its face but mind-bending in its application, has led to confusion and disagreement among panels of the Court of Appeals. See *State v. Clary*, 47 Kan. App. 2d 38, 270 P.3d 1206 (2012) (2-1 decision regarding whether K.S.A. 21-3420[c] created alternative means of kidnapping through use of phrase "to inflict bodily injury or to terrorize the victim or another"). Compare *State v. Foster*, 46 Kan. App. 2d 233, Syl. ¶ 1, 264 P.3d 116 (2011) (concluding use of terms "made," "altered," or "endorsed" in the forgery statute, K.S.A. 21-3710[a], did *not* create alternative means), *rev. granted* 293 Kan. 1109 (February 17, 2012) with *State v. Owen*, No. 102,814, 2011 WL 2039738, at *4-5 (Kan. App. 2011) (unpublished opinion (concluding those terms *did* create alternative means of committing forgery), *rev. granted* 293 Kan. 1112 (February 17, 2012); see also *State v. Killingsworth*, No. 104,690, 2012 WL 1759398, at *5-6 (Kan. App. 2012) (unpublished opinion) (noting confusion between multiple acts and alternative means).

Referring to this general, definitional sentence from *Timley*, Brown argues that the jury in his case was instructed on alternative means because it could have found he committed the crimes in one way if he had the intent to arouse or satisfy his own sexual desires or he could have committed the crimes in another way if he had the intent to arouse or satisfy G.V. His argument focuses simply on the fact that these possibilities were stated as alternatives—as terms stated in a series and separated by the disjunctive "or." In essence, his argument is that any such alternatives in a

statute that find their way into a jury instruction on the elements of a crime requires a super-sufficiency of evidence to support each alternative means.

The Washington Supreme Court, from whom we borrowed our single-sentence definition of "alternative means," recently rejected such a superficial view, stating: "The mere use of a disjunctive in a statute does not an alternative means crime make." *State v. Peterson*, 168 Wash. 2d 763, 770, 230 P.3d 588 (2010).

We agree. Identifying an alternative means statute is more complicated than spotting the word "or."

- *Legislative Intent Governs*

To determine if an "or" separates an option that is not an alternative means or separates alternative means, there are several considerations.

First, as with any situation in which the courts are called upon to interpret or construe statutory language, the touchstone is legislative intent. See *State v. Arnett*, 290 Kan. 41, 47, 223 P.3d 780 (2010); see also *State v. Arndt*, 87 Wash. 2d 374, 378-79, 553 P.2d 1328 (1976) (discussing role of legislative intent in determining if alternative means or separate crimes are set out in statutes). As the United States Supreme Court recognized in *Schad*: "Decisions about what facts are material and what are immaterial, or . . . what 'fact[s] [are] necessary to constitute the crime,' and therefore must be proved individually, and what facts are mere means, represent value choices more appropriately made in the first instance by a legislature than by a court." *Schad*, 501 U.S. at 638 (quoting *In re Winship*, 397 U.S. at 364); see *Peterson*, 168 Wash. 2d at 769; *State v. Smith*, 159 Wash. 2d 778, 784, 789, 154 P.3d 873 (2007).

To divine legislative intent, courts begin by examining and interpreting the language the legislature used. Only if that language is ambiguous do we rely on any revealing legislative history or background considerations that speak to legislative purpose, as well as the effects of application of canons of statutory construction. See *Double M Constr. v. Kansas Corporation Comm'n*, 288 Kan. 268, 271-72, 202 P.3d 7 (2009). Issues of statutory interpretation and construction, including issues of whether a statute creates alter-

native means, raise questions of law reviewable de novo on appeal. See *State v. Burnett*, 293 Kan. 840, 847, 270 P.3d 1115 (2012); see also *Kesselring*, 279 Kan. at 678 (court exercises de novo review over jury unanimity issues).

- *Alternative Means State Distinct, Material Elements*

In examining legislative intent, a court must determine for each statute what the legislature's use of a disjunctive "or" is intended to accomplish. Is it to list alternative distinct, material elements of a crime—that is, the necessary *mens rea, actus reus*, and, in some statutes, a causation element? Or is it to merely describe a material element or a factual circumstance that would prove the crime? The listing of alternative distinct, material elements, when incorporated into an elements instruction, creates an alternative means issue demanding super-sufficiency of the evidence. But merely describing a material element or a factual circumstance that would prove the crime does not create alternative means, even if the description is included in a jury instruction. See *Wright*, 290 Kan. at 201 ("*Timley* required sufficiency of evidence to support each alternative means *upon which a jury is instructed*, in order to protect a criminal defendant's right to a unanimous jury verdict." [Emphasis added.]); see also *Peterson*, 168 Wash. 2d at 769 (focus of the alternative means rule is on the jury instructions).

The Washington Supreme Court's decision in *Peterson* illustrates this emphasis on whether statutory alternatives list two or more essential, distinct elements, either (1) mental state, the *mens rea*, (2) conduct, the *actus reus*, or (3) in some statutes, an indispensable causation element. See *Peterson*, 168 Wash. 2d at 772.

The issue in *Peterson* was whether a statute requiring sex offenders to reregister within a certain time period if the offender changed residences set out alternative means of committing the crime. Under the Washington statute, the time period to reregister varied depending on the circumstances of the change of residence, specifically whether the offender became homeless, moved within a county, or moved to another county. The Washington court rejected the defense argument that the alternative factual circumstances constituted alternative means. In reaching this conclusion,

the court contrasted the registration statute with the Washington theft statute, which does set out distinct alternative means of committing the crime:

"The alternative means available to accomplish theft describe *distinct* acts that amount to the same crime. That is, one can accomplish theft by wrongfully exerting control over someone's property or by deceiving someone to give up their property. In each alternative, the offender takes something that does not belong to him, but his *conduct* varies significantly. In contrast, the failure to register statute contemplates a *single* act that amounts to failure to register: the offender moves without alerting the appropriate authority. His conduct is the same—he either moves without notice or he does not. The fact that different deadlines may apply, depending on the offender's residential status, does not change the nature of the criminal act: moving without registering." *Peterson*, 168 Wash. 2d at 770.

Because the alternatives stated in the sex offender registration statute were not material elements requiring two or more distinct—meaning separate or different—mental states, distinct conducts or distinct causations, the *Peterson* court held the registration statute did not create alternative means. *Peterson*, 168 Wash. 2d at 771-72 ("The 'elements of a crime' are commonly defined as ' "[t]he constituent parts of a crime—[usually] consisting of the actus reus, mens rea [*sic*], and causation—that the prosecution must prove to sustain a conviction." ' "); see K.S.A. 2011 Supp. 21-5201(a) ("A person commits a crime only if such person voluntarily engages in conduct, including an act, an omission or possession."); K.S.A. 2011 Supp. 21-5202(a) (defining culpable mental states and noting that "[e]xcept as otherwise provided, a culpable mental state is an essential element of every crime defined by this code"). The *Peterson* court concluded that the State could prove the crime of failure to register as a sex offender by establishing that the offender did not register within any of the time periods; the nature of the change of residence—homelessness, a move within a county, or a move to a different county—was not an element of the crime. *Peterson*, 168 Wash. 2d at 772. In other words, the alternatives described different circumstances or ways to prove the crime had been committed.

On its way to its conclusion in *Peterson*, the Washington court also referred to a line of cases in which it had drawn a critical

distinction between alternative means and "means within a means." *Peterson*, 168 Wash. 2d at 769-71 (citing *State v. Linehan*, 147 Wash. 2d 638, 644-45, 646-47, 56 P.3d 542 [2002]). This distinction provides yet another consideration for determining if a statute provides alternative means.

- *Options Within a Means Are Not Alternative Means*

The "means within a means" label was first used by the Washington Supreme Court in *In re Jeffries*, 110 Wash. 2d 326, 339-40, 752 P.2d 1338 (1988). In *Jeffries*, the court considered a defendant's contention that a jury was required to agree unanimously on alternative ways of satisfying each of several distinct aggravating circumstances that could lead to a conviction for aggravated murder in the first degree. Such an argument, the court noted, "raises the spectre of a myriad of instructions and verdict forms whenever a criminal statute contains several instances of use of the word 'or.'" *Jeffries*, 110 Wash. 2d at 339. The court regarded such an approach as unworkable and unjustified. See *Jeffries*, 110 Wash. 2d at 339-40.

After the *Jeffries* decision, the Washington Supreme Court further stated that "[a]s a general rule, [alternative means] crimes are set forth in a statute stating a single offense, under which are set forth more than one means by which the offense may be committed." *Smith*, 159 Wash. 2d at 784. Typically, it observed, a legislature will signal its intent to state alternative means through structure, separating alternatives into distinct subsections of the same statute. See *Smith*, 159 Wash. 2d at 784-86. Such structure is an important clue to legislative intent.

Regardless of such subsection design, however, a legislature may list additional alternatives or options within one alternative means of committing the crime. But these options within an alternative do not constitute further alternative means themselves if they do not state additional and distinct ways of committing the crime, that is, if they do not require proof of at least one additional and distinct material element. Rather they are only options within a means if, as discussed above, their role is merely to describe a material element or to describe the factual circumstances in which a material

element may be proven. *Smith*, 159 Wash. 2d at 783-87. In Washington at least, a " 'means within a means' scenario does not trigger jury unanimity protections." *Smith*, 159 Wash. 2d at 787.

In Kansas, we accept this general concept, which we would describe as the legislature's creation of an option within a means. An option within a means scenario is another important clue to legislative intent because such options signal secondary status rather than an intent to create a material, distinct element of the crime. Options within a means—that is, the existence of options that do not state a material, distinct element—do not demand application of the super-sufficiency requirement. See, *e.g.*, *Peterson*, 168 Wash. 2d at 769-72; see *McKoy*, 494 U.S. at 449 n.5 (Blackmun, J., concurring) (" '[u]nanimity . . . means more than a conclusory agreement' " but "does not require that each bit of evidence be unanimously credited or entirely discarded"; the jury must agree on " 'the principal factual elements underlying a specified offense' "); see also *Schad*, 501 U.S. at 636 n.6 (rejecting dissent's call for maximum verdict specificity and noting it would be "absurd" to require special verdicts as to every alternative in Arizona's premeditated murder statute: willfulness, deliberation, and premeditation); Beier, *Lurching Toward the Light: Alternative Means and Multiple Acts Law in Kansas*, 44 Washburn L.J. 275, 290 n.84 (2005) (discussing the progression between verdicts that are too general and those that would require a level of specificity more demanding than statutorily or constitutionally mandated).

The Washington Supreme Court in *Smith* explained that requiring jury unanimity on such secondary matters that do not state alternative means would not "advance[] the two underlying purposes of the alternative means doctrine." *Smith*, 159 Wash. 2d at 789. These purposes

"are to prevent jury confusion about what criminal conduct has to be proved beyond a reasonable doubt and to prevent the State from charging every available means authorized under a single criminal statute, lumping them together, and then leaving it to the jury to pick freely among the various means in order to obtain a unanimous verdict." *Smith*, 159 Wash. 2d at 789.

We agree that requiring jury unanimity on only the distinct, material elements of a crime—the alternative means—is enough to

satisfy these purposes. See *Smith*, 159 Wash. 2d at 789; see also *Schad*, 501 U.S. at 638 (discussing difference between "material" elements necessary to constitute crime and "immaterial" facts). Jury unanimity on options within a means—secondary matters—is generally unnecessary; therefore, on appeal, a super-sufficiency issue will not arise regarding whether there is sufficient evidence to support all options within a means.

The Washington Supreme Court has provided additional guidance as to what may be considered such secondary matters or options within a means.

(a) *Definitions May State Options Within a Means*

In drawing a line between material elements of a crime and secondary matters, in Washington, purely definitional statutory language that elaborates on or describes a material element has tended to signal a secondary matter—an option within a means—that does not raise an alternative means issue. See *Smith*, 159 Wash. 2d at 784-87.

For example, in *Linehan* the Washington Supreme Court considered whether embezzlement was an alternative means of committing theft. The court first looked to the material elements set out in the statute defining the *crime* of theft. Within that statute, the legislature provided for the alternative means of "wrongfully obtain[ing]" property or "exert[ing] unauthorized control" over property. The statute did not include a reference to "embezzlement." Rather, the term "embezzlement" surfaced only in a separate statute that defined the *terms* "wrongfully obtain" and "exert unauthorized control." See *Linehan*, 147 Wash. 2d at 643-46, 647-48.

The *Linehan* court emphasized that a statute defining the *crime* was "different in kind from those definition statutes that merely elaborate upon various terms or words." *Linehan*, 147 Wash. 2d at 648. Simply stated, the court held: "Definition statutes [that merely elaborate on elements rather than define the crime] do not create additional alternative means of committing an offense." *Linehan*, 147 Wash. 2d at 646; see *Smith*, 159 Wash. 2d at 794 (Bridge, J., dissenting) (noting importance of distinguishing between provi-

sions that define the material elements of the crime and provisions that define terms that explain the material elements of the crime).

(b) *Factual Circumstances Generally State Options Within a Means*

In addition, the *Linehan* court cited *State v. Laico*, 97 Wash. App. 759, 763, 987 P.2d 638 (1999), as an example in which statutory language purely descriptive of factual circumstances that may prove the crime signaled secondary matters not giving rise to an alternative means issue.

In *Laico*, the Washington Court of Appeals explained that the Washington assault statute's description of "great bodily harm" to include " 'bodily injury which creates a probability of death, or which causes significant serious permanent disfigurement, or which causes a significant permanent loss or impairment of the function of any bodily part or organ' " did not raise an alternative means issue when it was incorporated into a jury instruction. *Laico*, 97 Wash. App. at 762. These alternate factual circumstances, the court reasoned, are "merely descriptive of a term that constitutes, among other things, an element of the crime of first degree assault." *Laico*, 97 Wash. App. at 763. We note that this "merely descriptive" distinction drawn by the *Laico* court would essentially be echoed 11 years later in the *Peterson* court's dismissive treatment of the factual circumstances giving rise to a registering sex offender's need for change of residence. See *Peterson*, 168 Wash. 2d at 770.

Ultimately, in *Linehan* these definitions and factual description signals led the court to hold that embezzlement did not constitute an alternative means of committing theft. *Linehan*, 147 Wash. 2d at 646-50. "There is no requirement that the jury unanimously agree that Linehan's conduct satisfies [what] . . . is commonly referred to as theft by embezzlement, or that there be substantial evidence of theft by embezzlement." *Linehan*, 147 Wash. 2d at 650.

- *Summary*

In summary, in determining if the legislature intended to state alternative means of committing a crime, a court must analyze

whether the legislature listed two or more alternative distinct, material elements of a crime—that is, separate or distinct *mens rea*, *actus reus*, and, in some statutes, causation elements. Or, did the legislature list options within a means, that is, options that merely describe a material element or describe a factual circumstance that would prove the element? The listing of alternative distinct, material elements, when incorporated into an elements instruction, creates an alternative means issue demanding super-sufficiency of the evidence. Often this intent can be discerned from the structure of the statute. On the other hand, the legislature generally does not intend to create alternative means when it merely describes a material element or a factual circumstance that would prove the crime. Such descriptions are secondary matters—options within a means—that do not, even if included in a jury instruction, raise a sufficiency issue that requires a court to examine whether the option is supported by evidence.

### APPLICATION OF THIS ANALYSIS TO THIS CASE

Returning to the specifics of this case, we must examine our legislature's language defining the material elements of the crimes of aggravated indecent liberties with a child and lewd and lascivious behavior—language incorporated into the instructions to Brown's jury—to determine whether the statutory options on which he focuses on appeal were alternative means or merely secondary matters that do not demand application of the super-sufficiency requirement.

### Aggravated Indecent Liberties With A Child

For K.S.A. 21-3504(a), its structure is certainly a clue to legislative intent. The statute contains subsections that provide several alternative means of committing the crime of aggravated indecent liberties with a child. These alternatives state distinct or different material elements. They include: (1) sexual intercourse with a child who is 14 or 15 years of age (K.S.A. 21-3504[a][1]); (2) any lewd fondling or touching of either a child who is 14 or 15 years of age or of the offender "done or submitted to with the intent to arouse or satisfy the sexual desires of either the child or the offender, or

both" (K.S.A. 21-3504[a][2][A]); (3) causing a child who is 14 or 15 years of age "to engage in any lewd fondling or touching of the person of another with the intent to arouse or satisfy the sexual desires of the child, the offender or another" (K.S.A. 21-3504[a][2][B]); (4) any lewd fondling or touching of either a child who is under 14 years of age or the offender "done or submitted to with the intent to arouse or satisfy the sexual desires of either the child or the offender, or both" (K.S.A. 21-3504[a][3][A]); or (5) causing a child who is under 14 years of age "to engage in any lewd fondling or touching of the person of another with the intent to arouse or satisfy the sexual desires of the child, the offender or another" (K.S.A. 21-3504[a][3][B]).

The State charged Brown with only one of these alternative means of committing aggravated indecent liberties with a child, the one set forth in K.S.A. 21-3504(a)(3)(A). Brown focuses on the options internal to that statutory subsection—options within a means of "either the child or the offender, or both"—arguing they identify alternative means as well.

We reject Brown's argument. As discussed above, it is unlikely that the legislature intended for options within a means to constitute alternative means subject to the super-sufficiency requirement. In addition, the language on which Brown focuses is merely descriptive of the types of factual circumstances that may prove the distinct, material element of intent to arouse or satisfy sexual desires, that is, the *mens rea* required for commission of the offense. The crime occurs as soon as that *mens rea* coexists with the required *actus reus*, which is lewd fondling or touching of a child younger than 14 or of the offender; no distinct, material causation element exists in this statute. Actual arousal or satisfaction of the sexual desires of either participant is not necessary for the existence of the crime. It is purely incidental, as is the object of the required culpable mental state. See *State v. Sprung*, 294 Kan. 300, 310, 277 P.3d 1100 (2012) (discussing unit of prosecution test for multiplicity purposes, "K.S.A. 21-3504(a)(3)(A) possesses a unifying intent—'to arouse or to satisfy the sexual desires'—with the object of that intent being the child, the offender, or both").

We therefore hold that the legislature did not define the requisite *mens rea* element for aggravated indecent liberties with a child under K.S.A. 21-3504(a)(3)(A) in two or more distinct ways. The phrase "either the child or the offender, or both" merely describes a secondary matter, the potential yet incidental objects of the offender's required intent. This phrase also outlines options within a means, and it can be accurately described as purely descriptive of factual circumstances that may prove the distinct, material mental state element of the crime.

The result of this holding is that this is not an alternative means case and concerns of jury unanimity were not triggered by the words "either the child or the offender, or both" in K.S.A. 21-3504(a)(3)(A). The State chose only one means from the statute, and members of Brown's jury, following the instructions given in this case that incorporated the statutory language, had to agree unanimously that Brown possessed the culpable mental state of an intent to arouse or satisfy sexual desires, but they did not have to agree unanimously on who had those desires. As Brown concedes, proof that he intended to arouse or satisfy his own sexual desires was ample. He is thus not entitled to reversal, because the supersufficiency requirement of *Timley* does not apply and the one alternative chosen by the State was supported by substantial and sufficient evidence.

### Lewd And Lascivious Behavior

As with K.S.A. 21-3504(a), K.S.A. 21-3508(a) provides alternative means for committing the crime of lewd and lascivious behavior. The various subsections of the statute, again, provide a structural clue to the legislature's intent, stating distinct, material elements of intent and conduct, the *mens rea* and *actus reus*, that must coexist to have commission of the crime.

For example, one alternative prohibits publicly engaging in intercourse or sodomy under specified circumstances. K.S.A. 21-3508(a)(1). Another alternative, which was the only one with which Brown was charged in this case, prohibits "exposing a sex organ in the presence of a person who is not the spouse of the offender and who has not consented thereto, with intent to arouse or gratify the

sexual desires *of the offender or another.*" (Emphasis added.) K.S.A. 21-3508(a)(2).

Again, as with K.S.A. 21-3504(a), the distinct, material *mens rea* of the crime at issue, as articulated by the legislature, is the unified intent to arouse or gratify sexual desires. The legislature's further description of the potential incidental objects of that intent outline mere options within a means that are simply descriptive of the types of factual circumstances that may form the State's proof. The phrase "offender or another" does not create alternative means and does not trigger concerns of jury unanimity or demand application of the super-sufficiency requirement. Consequently, Brown is not entitled to reversal of his conviction for lewd and lascivious behavior.

*Conclusion*

Having disposed of the alternative means claims in this appeal, we take this opportunity to again urge prosecutors and trial judges to attempt as much verdict specificity as possible by tailoring their jury instructions to the proof in a given case. The State should decide which alternatives it wants the jury to consider and advise the court of proposed instructions that eliminate options on which the State does not rely. And the court should consider whether there is *zero* evidence related to any option stated in a statute; if there is no evidence to support the option, it should not be included in a jury instruction. Such tailoring may avoid a later appellate fight over whether a statute sets out alternative means of committing the crime or over whether the super-sufficiency requirement has been met. See *Schad v. Arizona,* 501 U.S. 624, 645, 111 S. Ct. 2491, 115 L. Ed. 2d 555 (1991). Tailoring of instructions holds the most promise for minimizing the risk of reversal compelled by *State v. Timley,* 255 Kan. 286, 875 P.2d 242 (1994).

## REOPENING THE STATE'S CASE

In his second issue, Brown contends the trial court erred in allowing the State to reopen its case-in-chief to present evidence of Brown's age at the time of the aggravated indecent liberties with a child offense. He asserts this court must vacate his sentence and

remand with directions that the aggravated indecent liberties with a child conviction be sentenced as a severity level 3 person felony, rather than an off-grid person felony.

The trial court's ruling came after the jury had been told it had heard all of the evidence. The jury had been sent home and instructed to return the next day to hear the jury instructions and closing arguments. The next morning, when the trial reconvened, the State made its motion to reopen its case. The prosecutor acknowledged there was no direct evidence of Brown's date of birth and that proof of age was necessary if Brown was going to be convicted of a Jessica's Law offense under K.S.A. 21-4643. The prosecutor stated that the evidence of Brown's date of birth was not elicited during the State's case-in-chief because of "an oversight." The State argued that reopening its case for this question was not prejudicial to Brown because "it really is not what the defense was based on in this case." Defense counsel objected to the motion.

The trial court permitted the State to reopen its case. See K.S.A. 22-3414(2). The court expressly applied the factors listed in *State v. Murdock*, 286 Kan. 661, Syl. ¶¶ 4, 5, 187 P.3d 1267 (2008). In *Murdock*, this court, quoting from *United States v. Blankenship*, 775 F.2d 735, 741 (6th Cir. 1985), explained the factors a trial court should consider in exercising its discretionary authority to allow a party to reopen its case:

" 'In exercising its discretion, the court must consider the timeliness of the motion, the character of the testimony, and the effect of the granting of the motion. The party moving to reopen should provide a reasonable explanation for fail[ing] to present the evidence in its case-in-chief. The evidence proffered should be relevant, admissible, technically adequate, *and helpful to the jury in ascertaining the guilt or innocence of the accused.* The belated receipt of such testimony should not "imbue the evidence with distorted importance, prejudice the opposing party's case, or preclude an adversary from having an adequate opportunity to meet the additional evidence offered." [Citation omitted.]' " (Emphasis added.) *Murdock*, 286 Kan. at 672-73.

In reviewing these factors, the trial court noted that an element of a criminal offense can be proven by circumstantial evidence and, given that Brown was in his 60's, the jury could find this over-the-age-of-18 element from its viewing of Brown in the videotaped

interview. Based on this, the court determined that the additional evidence the State wished to present would not "imbue the evidence with distorted importance." The court likewise reasoned that Brown would not be overly surprised by the additional testimony. Further, the testimony, according to the court, was relevant, admissible, technically adequate, and helpful to the jury.

In addition to applying the *Murdock* factors, the court allowed Brown the opportunity to reopen his case and challenge this additional evidence if he wished to do so. The court noted this procedure would not depart drastically from the typical order of trial because the defense had not presented any evidence and the State's motion was made prior to the parties' closing arguments and prior to the jury receiving its instructions.

In arguing this ruling was in error, Brown takes issue with only two aspects of the trial court's ruling—the trial court's determination that the evidence of age would be helpful to the jury in determining his guilt or innocence and the conclusion that Brown was not prejudiced by the reopening. Therefore, we accept that all other *Murdock* factors weigh in favor of allowing the State to reopen its case. See *State v. Raskie*, 293 Kan. 906, 919, 269 P.3d 1268 (2012) (failure to adequately brief issue constitutes waiver).

*District Court Standard and Standard of Appellate Review*

The trial court's authority for reopening the case after the State had rested is found in K.S.A. 22-3414. That statute outlines the order of a criminal trial and provides that once all parties have completed their case-in-chief, "[t]he parties may then respectively offer rebutting testimony only, unless the court, for good cause, permits them to offer evidence upon their original case." K.S.A. 22-3414(2). This good-cause standard implies discretion, and that is the standard we have applied in past cases. See *State v. Horton*, 292 Kan. 437, 439, 254 P.3d 1264 (2011) (listing long line of cases recognizing that a trial court has the discretionary option to reopen a party's case). As we previously noted, in *Murdock* we adopted factors that govern the trial court's application of the good-cause standard, and the trial court in this case applied those factors.

Regarding appellate review of the trial court's ruling, in *Murdock* we stated that an appellate court reviews a trial court's decision to permit the State to reopen its case for an abuse of discretion. *Murdock*, 286 Kan. at 672. After the *Murdock* decision, we restated our abuse of discretion standard in a three-part statement that gathered various strands of cases stating the abuse of discretion standard in different ways. Under this three-part standard, judicial discretion is abused if judicial action (1) is arbitrary, fanciful, or unreasonable; in other words, if no reasonable person would have taken the view adopted by the trial court; (2) is based on an error of law; in other words, if the discretion is guided by an erroneous legal conclusion; or (3) is based on an error of fact; in other words, if substantial competent evidence does not support a factual finding on which a prerequisite conclusion of law or the exercise of discretion is based. *State v. Ward*, 292 Kan. 541, 550, 256 P.3d 801 (2011), *cert. denied* 132 U.S. 1594 (2012).

*Assisting the Jury in Ascertaining Guilt or Innocence*

Citing *State v. White*, 279 Kan. 326, 332, 109 P.3d 1199 (2005), which was a case that stated the abuse of discretion standard in terms similar to the second prong of the *Ward* standard, Brown contends the trial court committed a legal error as part of its analysis that evidence of Brown's date of birth would assist the jury in ascertaining Brown's guilt or innocence. Specifically, Brown argues this ruling was dependent on the belief that age was an element of the charged crime of aggravated indecent liberties with a child. To the contrary, Brown argues age is not an element of the offense. To support his argument, Brown cites *State v. Morningstar*, 289 Kan. 488, 213 P.3d 1045 (2009).

In *Morningstar*, the defendant contended there was insufficient evidence to convict him of rape of a child under the age of 14 in violation of K.S.A. 21-3502(a)(2) because the State failed to present any evidence that the defendant was 18 years or older. In addressing this issue, the court stated:

"[T]he express terms of K.S.A. 21-3502(a)(2) contain two elements of rape: (1) sexual intercourse; and (2) with a child who is under 14 years of age. *The defendant's age is not an element under this statute.* It is the enhanced sentencing statute,

K.S.A. 21-4643, that requires the additional factual determination about the defendant's age before a court may impose a life sentence." *Morningstar*, 289 Kan. at 493-94.

The court thus ruled that omitting the defendant's age from the complaint or the jury instructions did not eliminate the existence of the crime of rape of a child under 14 years of age or invalidate a criminal conviction of that offense. *Morningstar*, 289 Kan. at 494. Nevertheless, because the State failed to present any evidence of the defendant's age at trial and failed to instruct the jury on his age, the court vacated the defendant's off-grid sentence and remanded for resentencing on the Kansas Sentencing Guidelines Act grid. *Morningstar*, 289 Kan. at 495.

Brown relies on the language from *Morningstar*, 289 Kan. at 494, that "[t]he defendant's age is not an element under this statute" to support his argument that his age was not helpful to the jury in determining his "guilt or innocence." Brown is technically correct; evidence of his age was not necessary for the jury to find him guilty of aggravated indecent liberties with a child. Nonetheless, age is an element of the greater offense of aggravated indecent liberties punishable under Jessica's Law, K.S.A. 21-4643, as this court has repeatedly held in the context of defendants' challenges to their off-grid sentences when evidence that they were over the age of 18 was neither presented to the jury nor included in the jury instructions. As the court stated in *State v. Reyna*, 290 Kan. 666, 676, 234 P.3d 761 (2010), based on *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000):

[T]he defendant's age at the time of the offense *is an element of the crime if the State seeks to convict the defendant of the more serious, off-grid enhanced offense.* See [*State v. Gonzales*, 289 Kan. 351, 366-70, 212 P.3d 215 (2009)]; [*State v. Bello*, 289 Kan. 191, 195-98, 211 P.3d 139 (2009)]. The State's argument that the age issue is merely a sentencing factor that, like a prior offense, may be determined by the judge at sentencing ignores the full impact of *Apprendi.*" (Emphasis added.)

See, *e.g., State v. Chanthaseng*, 293 Kan. 140, 151, 261 P.3d 889 (2011) (based on *Apprendi*, defendant's age at the time of the offense is an element of the crime if the State seeks to convict defendant of the off-grid level of the offense); *State v. Brown*, 291

Kan. 646, 662, 244 P.3d 267 (2011) (same); *State v. Colston*, 290 Kan. 952, 973, 235 P.3d 1234 (2010) (same).

In this case, the complaint charged Brown with an off-grid crime for "Aggravated Indecent Liberties With a Child, (an Off-grid Person Felony; Penalty: Pursuant to K.S.A. 21-4643—25 years to life in prison; Defendant was over the age of 18 at the time of the commission of the offense, D.O.B. 10/18/1947)." And the trial court instructed the jury that to convict Brown of the crime, the State must prove "[t]hat at the time of the act the defendant was 18 years of age or older." Thus, as the State argues, to obtain a conviction on the more serious, off-grid offense with which the State charged Brown, the State was required to prove Brown's age at the time of the offense was 18 years or older.

Hence, the trial court was correct in determining that knowing Brown's date of birth would assist the jury in determining Brown's guilt or innocence of the greater offense under Jessica's Law. Significantly, the trial court found there was already circumstantial evidence of age in the record because an admitted exhibit, the videotaped interview of Brown, provided visual evidence that Brown was well over 18 years of age. This finding is not challenged on appeal. Therefore, the evidence presented when the State's case was reopened was not essential to the State's case. Yet, evidence of Brown's date of birth assisted the jury's consideration of whether the State proved the age element of the greater offense of aggravated indecent liberties with a child as charged under Jessica's Law. As such, Brown's argument—that the trial court's decision to allow the State to reopen his case was guided by an erroneous legal conclusion—fails.

*Prejudice*

Brown also argues the trial court erred in determining that Brown was not prejudiced by the reopening of the State's case. He argues that the trial court's ruling subjected him to a substantially longer sentence (lifetime imprisonment versus 100 months' imprisonment).

The determination of whether the trial court erred in concluding that Brown was not prejudiced by the reopening of the State's case

is reviewed under the broadest abuse of discretion analysis—the first prong of the *Ward* standard—that upholds a trial court's determination unless no reasonable person could agree. *Ward*, 292 Kan. at 550 (stating standard); *Murdock*, 286 Kan. at 672 (applying standard to ruling on State's motion to reopen its case).

As the *Murdock* court noted, *Blankenship* provides that the " 'most important consideration' " in determining whether a party should be permitted to reopen its case is " 'whether the opposing party is prejudiced by reopening.' " *Murdock*, 286 Kan. at 673 (quoting *Blankenship*, 775 F.2d at 741). The *Blankenship* court stated:

"One of the critical factors in evaluating prejudice is the timing of the motion to reopen. If it comes at a stage in the proceedings where the opposing party will have an opportunity to respond and attempt to rebut the evidence introduced after reopening, it is not nearly as likely to be prejudicial as when reopening is granted after all parties have rested, or even after the case has been submitted to the jury." *Blankenship*, 775 F.2d at 741.

In *Blankenship*, the court noted that while the defendant objected to the reopening, he did not attempt to challenge the additional evidence. Nor could he have been surprised by the additional evidence, the court reasoned, because it was nothing more than a positive identification of the defendant. *Blankenship*, 775 F.2d at 741.

In *Murdock*, the court likewise noted that the motion to reopen was made immediately after the State rested its case-in-chief and before the defendant offered any evidence, allowing the defendant the opportunity to respond to and rebut the additional evidence. The court determined that admitting the evidence at this time did not imbue the evidence with distorted importance, prejudice the defendant's case, or preclude the defendant from the opportunity to defend against the additional evidence offered. And the *Murdock* court noted that the evidence was not prejudicial to the defendant because it was evidence presented at the preliminary hearing and, therefore, known to the defendant. *Murdock*, 286 Kan. at 675.

Here, although both parties had rested before the State sought to reopen its case, the court offered Brown the opportunity to

present rebuttal evidence. More significantly, the trial court made a factual finding that there was already circumstantial evidence in the record from which the jury could conclude Brown was older than 18 years of age. As support for this finding, the trial court cited an admitted exhibit, the videotaped interview of Brown. Given this factual finding that is supported by an admitted exhibit, we conclude no legal prejudice resulted from the trial court allowing the State to reopen its case to call a witness to testify to something already established by circumstantial evidence. See *Murdock*, 286 Kan. at 685 (Beier, J., concurring in part).

Hence, we conclude that in this Jessica's Law case the trial court did not abuse its discretion when it allowed the State to reopen its case to prove Brown's age because there was already circumstantial evidence of age, the additional evidence was helpful to the jury in ascertaining whether the State had established the elements of the greater offense of aggravated indecent liberties with a child punishable under Jessica's Law, and there was no legal prejudice to Brown.

## PROSECUTORIAL MISCONDUCT

Brown contends the prosecutor committed reversible misconduct with two statements he made during jury selection and one statement made during closing argument.

### *Standard of Review*

An appellate court's review of an allegation of prosecutorial misconduct requires application of the familiar two-step analysis. First, the appellate court decides whether the prosecutor's comments exceed the wide latitude of language and manner afforded the prosecutor when discussing the evidence. Second, the court determines whether the prosecutor's comments constitute plain error. This occurs when the statements show ill will by the prosecutor or are so gross and flagrant that they prejudice the jury against the defendant and deny the defendant a fair trial. See *Raskie*, 293 Kan. at 914 (citing *State v. Tosh*, 278 Kan. 83, 85, 91 P.3d 1204 [2004]); *State v. Inkelaar*, 293 Kan. 414, 428, 264 P.3d 81 (2011). This

second step involves several considerations that we will more fully discuss after examining whether there was misconduct.

*Challenged Statements*

Brown challenges the following italicized statements made by the prosecutor during jury selection:

"[The State]: This is a serious case. I certainly don't want the fact that we have a little bit of laughter when we do voir dire, that may make you think it's not a serious case. It is a very serious case for the defendant and a very serious case for the State. It is going to be a potentially emotional case, as well because we have a little girl who had *some bad things happen to her*. And that's what the State is going to demonstrate to you. Is there anyone, who by the nature of the charges, just thinks to themselves: I can't sit through this. There is no way I can sit through something like this. Any hands? [Juror]?

"[Juror]: Because I'm pregnant, I've been very emotional lately. I might be able to; I might break down.

"[The State]: [Juror], you wouldn't—or would you allow those emotions to be the basis for those decisions? Or would you try to use reason? Or would you just use emotion?

"[Juror]: I would definitely try to use reason.

"[The State]: *There is nothing wrong with using emotions either*. Everyone has emotions. We're not asking you to set that completely aside. You're going to [*sic*] moved, but your decision needs to be based on the facts and the law, and not just emotion. Any other questions on that?" (Emphasis added.)

Brown argues the first statement—"some bad things happened to her"—was an expression of the prosecutor's personal belief of Brown's guilt. He argues the second statement—"[t]here is nothing wrong with using emotions either"—distracted the jury from its duty to base its decision on the law and the facts.

Brown also challenges the following statement made by the prosecutor during closing argument: "I will submit, the next element is the one you would probably talk about the most when you are in that jury room, that the defendant fondled or touched the person of [G.V.] in a lewd manner. *I don't think there is really a question of that*. It's for you to decide because you're the fact-finder, but you heard what [G.V.] told you." (Emphasis added.)

*Step 1: Misconduct*

(a) *Personal Opinion of Guilt*

Brown contends that with the first statement in jury selection and the statement during closing argument, the prosecutor "bookended the trial with two statements expressing his belief that Mr. Brown was guilty."

The State acknowledges that it is improper for a prosecutor to express a " 'personal opinion regarding the ultimate guilt or innocence of the defendant.' " See *State v. Bennington*, 293 Kan. 503, 530, 264 P.3d 440 (2011) (quoting *State v. Corbett*, 281 Kan. 294, 315, 130 P.3d 1179 [2006]); see also Kansas Rules of Professional Conduct (KRPC) 3.4 (2011 Kan. Ct. R. Annot. 566) ("A lawyer shall not: . . . (e) in trial, . . . state a personal opinion as to the justness of a cause, the credibility of a witness, the culpability of a civil litigant or the guilt or innocence of an accused."); KRPC 3.8 (2011 Kan. Ct. R. Annot. 578) (special duties of a prosecutor). Additionally, the State essentially concedes that the statement made during closing argument—"I don't think there is really a question of that"—was a personal opinion of guilt. As to the statement during voir dire—"some bad things happened to [G.V.]"— the State argues this was just an expression of the nature of the alleged crimes in the context of an attempt to see if any of the potential jurors should be excused because of an inability to handle the emotional nature of the testimony and trial.

While this may have been the purpose of the exchange, the statement was an affirmative statement that bad things happened. It was not couched in terms such as "it is alleged" or "the State intends to prove." Rather, it was stated as a fact. Although not preceded by "I believe" or similar words, the prosecutor's statement was the equivalent of a personal expression of guilt.

(b) *Encouraging Use of Emotion*

Brown also contends the prosecutor's statement that there is "nothing wrong with using emotions" improperly " 'distract[ed] the jury from its duty to make decisions based on the evidence and the controlling law.' " Indeed, as we have often stated: "Prosecutors are not allowed to make statements that inflame the passions or

prejudices of the jury or distract the jury from its duty to make decisions based on the evidence and the controlling law." *State v. Baker*, 281 Kan. 997, 1016, 135 P.3d 1098 (2006).

The State argues the prosecutor was acknowledging that the trial evidence may take an emotional toll on the jury but reiterating that the jury's "decision needs to be based on the facts and the law, and not just emotion." A correct statement would have been that the jury's decision needs to be based on the facts and the law. See *Raskie*, 293 Kan. 906, Syl. ¶ 3 ("[A] prosecutor may comment on admitted evidence as long as the remarks accurately reflect the evidence, accurately state the law, and are not intended to inflame the passions or prejudices of the jury or divert the jury from its duty to decide the case based on the evidence and the controlling law."); PIK Crim. 3d 51.07 ("You must consider this case without favoritism or sympathy for or against either party. Neither sympathy nor prejudice should influence you.") (This instruction is disapproved for general use.).

Instead of explaining that the decision needs to be based on the facts and the law, the prosecutor added the statement, "and not just emotion." This misstatement was emphasized by the statement, "There is nothing wrong with using emotions either." While these statements may not have been intended to inflame the passions of the jury, they distracted the jury from making its decision based on the evidence and the controlling law.

*Step 2: Harmlessness Inquiry*

Having found that there was misconduct, we next consider whether the prosecutor's misconduct was so prejudicial that it denied the defendant a fair trial. This requires a harmlessness inquiry. Three factors are considered: (1) Is the misconduct so gross and flagrant it denied the accused a fair trial; (2) Do the remarks show ill will by the prosecutor; and (3) Is the evidence against the defendant of such a direct and overwhelming nature that the prosecutor's statements would not have much weight in the jurors' minds? No individual factor controls. See *Inkelaar*, 293 Kan. at 427.

Under the third factor, the State, as the party who benefitted from the misconduct, bears the burden to establish beyond a reasonable doubt that the error did not affect the defendant's substantial rights; in other words, that there is no reasonable possibility the error affected the verdict. In short, the third factor cannot override the first two factors unless we are able to say the constitutional error standard of *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705, *reh. denied* 386 U.S. 987 (1967), has been met. *Inkelaar*, 293 Kan. at 430-31.

Applying these factors, we conclude the prosecutor's statements were gross and flagrant because they broke well-established and long-standing rules regarding the latitude of prosecutors. See *State v. Kemble*, 291 Kan. 109, 121-25, 238 P.3d 251 (2010) (factors demonstrating gross and flagrant conduct include repeated comments, emphasis on an improper point, planned or calculated statements, violation of a well-established, "unequivocal" rule, violation of a rule designed to protect a constitutional right, and longstanding nature of the rule). Even if the misstatements were merely inarticulate or imprecise wording and not intentional, a prosecutor should be sensitive to our repeated warnings to not state personal opinions of guilt or unduly draw on sympathy. Further, the instances were repeated. These factors also provide some evidence of ill will. See *Inkelaar*, 293 Kan. at 430 (ill will demonstrated by deliberate conduct, repeated improper statements, or apparent indifference to a court's ruling).

Nevertheless, there is no other indication in the record that these misstatements were the result of ill will on the part of the prosecutor. The points were not emphasized by the prosecutor, the prosecutor did not make the statements in defiance of court rulings, and the prosecutor exhibited no other behavior suggesting ill will.

Furthermore, we conclude there is no reasonable possibility the misconduct affected the verdict. The trial court instructed the jury that it was to base its decision on the law and the facts, and nothing suggests the jury did not follow that admonition. And the prosecutor's statements suggesting his belief in guilt were tempered by other statements that reminded the jury it was the finder of fact. Additionally, although the evidence against Brown consisted almost

entirely of G.V.'s statements and testimony, the evidence was consistent. Brown himself lent credence to G.V.'s testimony by substantiating that the two of them slept naked in the same bed and that he rubbed lotion on G.V, which he stated she loved. The discovery of lotion and the child-sized apron provide further support for G.V.'s testimony.

Hence, while we find misconduct, that misconduct was harmless.

### LIFETIME POSTRELEASE SUPERVISION RATHER THAN PAROLE

Brown's next issue on appeal relates to his sentence for the off-grid offense of aggravated indecent liberties with a child. The trial court sentenced Brown to life imprisonment with a mandatory minimum term of imprisonment of not less than 25 years under Jessica's Law (an indeterminate sentence) and also imposed a term of lifetime postrelease supervision. Brown contends the trial court erred in imposing lifetime postrelease supervision, rather than parole.

This court has previously decided this issue, concluding that " '[a]n inmate who has received an off-grid indeterminate life sentence can leave prison only if the successor to the Kansas Parole Board grants the inmate parole. Therefore, a sentencing court has no authority to order a term of postrelease supervision in conjunction with an off-grid indeterminate life sentence.' " *State v. Summers*, 293 Kan. 819, 832, 272 P.3d 1 (2012) (quoting *State v. Cash*, 293 Kan. 326, Syl. ¶ 2, 263 P.3d 786 [2011]).

In light of this authority, the State concedes this issue but points out that the trial court did not announce the term of lifetime postrelease supervision from the bench during the sentencing proceeding. Nevertheless, the journal entry reflected lifetime postrelease supervision as part of the sentence. As the State points out, the error lies with the journal entry, not the announced sentence.

Therefore, we vacate the journal entry and remand with directions to enter a nunc pro tunc order that conforms the journal entry to the announced sentence. See K.S.A. 22-3504(1); *State v. McKnight*, 292 Kan. 776, 779, 257 P.3d 339 (2011) (sentence is effective when pronounced from the bench); *State v. Lyon*, 207 Kan.

378, 381-82, 485 P.2d 332 (1971) (allowing State's nunc pro tunc motion to correct journal entry to conform with sentence).

### APPRENDI/IVORY ISSUE

Brown also argues the trial court violated his jury-trial rights under *Apprendi v. New Jersey*, 530 U.S. 466, 490, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000), when it considered his prior convictions in determining his sentence without requiring those convictions to be included in the criminal complaint or proved to a jury beyond a reasonable doubt.

Brown acknowledges that this court has consistently rejected this argument. See, *e.g.*, *Bennington*, 293 Kan. 503, Syl. ¶ 9; *State v. Riojas*, 288 Kan. 379, 388, 204 P.3d 578 (2009); *State v. Fewell*, 286 Kan. 370, 394-96, 184 P.3d 903 (2008); *State v. Ivory*, 273 Kan. 44, 46-48, 41 P.3d 781 (2002). The use of prior convictions for sentencing enhancement is constitutional.

Brown's convictions are affirmed, his sentence is affirmed in part and vacated in part, and the case is remanded with directions.

\* \* \*

MORITZ, J., concurring: While I agree with the rationale developed by the majority for determining whether a statute contains alternative means, I respectfully concur in the decision because I would find it unnecessary to engage in that analysis in this case. Instead, I would accept the State's invitation to reconsider *State v. Wright*, 290 Kan. 194, 224 P.3d 1159 (2010), and I would find that *Wright* permits a modified harmless error analysis in this case.

Specifically, I would find that when there is sufficient evidence of one alternative means but *no* evidence or argument regarding another means and thus no possibility of jury confusion, we need not engage in a complicated analysis to determine whether the legislature intended terms separated by an "or" to be alternative means. As the majority states:

"In examining legislative intent, a court must determine *for each statute* whether the legislature's use of a disjunctive 'or' is intended to accomplish. Is it to list alternative distinct, material elements of a crime—that is, the necessary *mens rea*, *actus reus*, and, in some statutes, a causation element? Or is it merely

to describe a material element or a factual circumstance that would prove the crime." (Emphasis added.) *Brown*, slip op. at 17.

While I agree with the "identification approach" developed in this case for determining when a statute sets out alternative means and will apply that approach in future cases, I am concerned that this approach will needlessly result in inconsistent and result-oriented decisions. Instead, in this case as well as others, I would accept for purposes of argument Brown's claim that the trial court instructed the jury on alternative means for which there was no evidence. Based on Brown's concession that there was no evidence to support one means, I would find there was no possibility of jury confusion as to that means and any error was harmless beyond a reasonable doubt.

## THIS COURT ADOPTED THE *GRIFFIN* RATIONALE IN *GRISSOM*

I find the genesis, but not the complete rationale, for this approach in *Griffin v. United States*, 502 U.S. 46, 112 S. Ct. 466, 116 L. Ed. 2d 371 (1991), *reh. denied* 502 U.S. 1125 (1992). There, the United States Supreme Court held that neither the Due Process Clause of the Fifth Amendment to the United States Constitution nor United States Supreme Court precedent required reversal of a general guilty verdict on a multiple-object conspiracy in a federal prosecution when the evidence was inadequate to support conviction as to one of the objects of the conspiracy. The *Griffin* Court specifically distinguished cases in which convictions were based on legally insufficient grounds, *i.e.*, unconstitutional provisions of a statute or legally insufficient proof, from convictions based on insufficient factual proof to support one of several bases for the convictions. 502 U.S. at 51-60. The Court's reasoning is instructive:

"Jurors are not generally equipped to determine whether a particular theory of conviction submitted to them is contrary to law—whether, for example, the action in question is protected by the Constitution, is time barred, or fails to come within the statutory definition of the crime. When, therefore, jurors have been left the option of relying upon a legally inadequate theory, there is no reason to think that their own intelligence and expertise will save them from that error. Quite the opposite is true, however, when they have been left the option of relying upon a

factually inadequate theory, since jurors *are* well equipped to analyze the evidence, [citation omitted]. . . .

. . . .

". . . [I]f the evidence is insufficient to support an alternative legal theory of liability, it would generally be preferable for the court to give an instruction removing that theory from the jury's consideration. The refusal to do so, however, does not provide an independent basis for reversing an otherwise valid conviction." 502 U.S. at 59-60.

What I take from *Griffin* is that we can rely upon the jury to do what we instruct them to do—*i.e.*, apply the law to the evidence and arrive at a verdict. So when we instruct a jury on a legal means for committing a crime for which there is *no* evidence and an alternative means of committing the same crime for which there is *sufficient* evidence and the jury convicts the defendant of that crime, we can reliably conclude it did so unanimously upon the *only* means for which there was evidence.

Significantly, in *State v. Grissom*, 251 Kan. 851, 892, 840 P.2d 1142 (1992), this court adopted the above-quoted passage from *Griffin* and specifically disapproved of this court's earlier decision in *State v. Garcia*, 243 Kan. 662, Syl. ¶ 6, 763 P.2d 585 (1988). In *Garcia*, this court had held that " '[a] general verdict of guilty must be set aside if the jury was instructed that it could rely on any of two or more independent grounds, and one of those grounds is insufficient.' " See *Grissom*, 251 Kan. at 890, 892.

Ultimately, the *Grissom* court applied *Griffin* to conclude that "Grissom's challenge to the three first-degree murder convictions [was] factual," and "[b]ecause he was charged in the alternative, if there is sufficient evidence to convict him *of either* premeditated or felony murder, the general verdict should be upheld." (Emphasis added.) 251 Kan. at 893. Because the court found sufficient evidence to support premeditation, the court found it unnecessary to consider whether there was sufficient evidence to convict Grissom of the felony murders of the three victims. 251 Kan. at 893.

While I do not agree with *Grissom's* wholesale adoption of *Griffin*, *Grissom* had it partially right. And as discussed below, because *Wright* did not overrule *Grissom's* adoption of the *Griffin* approach, I would take this opportunity to clarify our application of that approach.

*TIMLEY* DID NOT EXPLICITLY REJECT THE *GRIFFIN* RATIONALE

Two years after *Grissom*, in *State v. Timley*, 255 Kan. 286, 289-90, 875 P.2d 242 (1994), this court quoted a discussion from *State v. Kitchen*, 110 Wash. 2d 403, 410, 756 P.2d 105 (1988), which set forth a "super-sufficiency" concept. This concept, unlike the rule adopted in *Grissom*, requires "substantial evidence" to support each alternative means upon which the jury is instructed. Notably, this court did not discuss or specifically adopt this concept in *Timley*, although it did reiterate the quote from *Kitchen*. See *Timley*, 255 Kan. 286, Syl. ¶ 1. Instead, it simply quoted from *Kitchen* in order to explain the distinction between multiple acts and alternative means. The *Timley* court then pointed out that *Grissom* "recognized and discussed the alternative means rule" and cited the following language from *Grissom*:

> " 'If an accused is charged in one count of an information with both premeditated murder and felony murder, it matters not whether some members of the jury arrive at a verdict of guilt based on proof of premeditation while others arrive at a verdict of guilt by reason of the killer's malignant purpose. Furthermore, the State is not required to elect between premeditated and felony murder because K.S.A. 21-3401 established the single offense of murder in the first degree and only provides alternate methods of proving the crime.' " *Timley*, 255 Kan. at 290 (quoting *Grissom*, 251 Kan. 851, Syl. ¶ 7).

Unfortunately, *Timley* did not address the logical disconnect between quoting the "super-sufficiency" concept set forth in *Kitchen*, which requires "substantial evidence" to support each alternative means upon which the jury is instructed, and simultaneously reiterating language from *Grissom* which explicitly rejected any "super-sufficiency" requirement. *Timley*, 255 Kan. at 289-90. Assuming the *Timley* court was cognizant of this inconsistency, it seems likely the failure to address it was driven by the result in *Timley*, *i.e.*, the State presented sufficient evidence of both means so it was unnecessary to address the conflict.

In any event, even if *Timley* could be interpreted to have adopted *Kitchen*'s approach of requiring substantial evidence of both means, it is clear that *Timley* did not resolve, or even touch upon, the next logical issue—*e.g.*, whether reversal is automatically

required when evidence of one means is insufficient or whether the court can apply a harmless error analysis.

## THIS COURT APPLIED A HARMLESS ERROR APPROACH IN *DIXON*

More than 10 years later, in *State v. Dixon*, 279 Kan. 563, 602, 606, 112 P.3d 883 (2005), *disapproved of by Wright*, 290 Kan. 194, the court had an opportunity to reach the harmless error issue. In *Dixon*, the court recognized *Timley's* "substantial evidence" approach and, applying that approach, found "strong evidence supporting at least one theory of each burglary and *no* evidence of at least one other theory." (Emphasis added.) *Dixon*, 279 Kan. at 606; see *Wright*, 290 Kan. at 204-06.

However, the *Dixon* court did not reverse outright the conviction for which there was no evidence. But see 279 Kan. at 622 (Beier, J., concurring in part and dissenting in part) ("I would reverse the defendant's two burglary convictions as a straightforward and consistent application of our alternative means rule from *State v. Timley*, 255 Kan. 286, 289, 875 P.2d 242 [1994]."). Nor did the court reverse the conviction and remand for a new trial on the means for which there was sufficient evidence. See Beier, *Lurching Toward the Light: Alternative Means and Multiple Acts Law in Kansas*, 44 Washburn L.J. 275, 294 (2005) (following a reversal for insufficient evidence of an alternative means, the defendant "can only be retried on the theory for which evidence was sufficient the first time, without the pollution of evidence or argument supporting the alternative theory"); *State v. Stevens*, 36 Kan. App. 2d 323, 346-48, 138 P.3d 1262 (2006) (Johnson, J., dissenting) (concluding the State failed to prove the alternative means of attempting to operate a vehicle while under the influence and suggesting reversal and remand for retrial upon the means for which there was sufficient evidence—operating a vehicle while under the influence), *aff'd in part, rev'd in part* 285 Kan. 307, 172 P.3d 570 (2007).

Instead, the court applied a harmless error analysis, albeit without specifically identifying it as such. See *Dixon*, 279 Kan. at 604 ("The remaining question is whether Dixon's burglary convictions can stand in spite of the absence of evidence sufficient to support each theory for the burglary charges."). The *Dixon* court ultimately

affirmed the defendant's burglary convictions based on "strong evidence supporting at least one theory of each burglary and no evidence of at least one other theory." 279 Kan. at 606. In adopting this harmless error approach, *Dixon* cited extensively from *State v. Johnson*, 27 Kan. App. 2d 921, 11 P.3d 67, *rev. denied* 270 Kan. 901 (2000), an alternative means case in which the Court of Appeals applied *Griffin*. See *Johnson*, 27 Kan. App. 2d at 923-26 (applying *Griffin* to find harmless error when defendant was convicted of kidnapping by "force, threat or deception," and there was overwhelming evidence of threat, "little" evidence of force, and no evidence of deception). The *Johnson* panel also cited and distinguished *State v. Ice*, 27 Kan. App. 2d 1, 997 P.2d 737 (2000), which I discuss later in this concurrence, wherein a separate Court of Appeals panel also applied and distinguished *Griffin*. See *Johnson*, 27 Kan. App. 2d at 925.

### *Wright* Clarified What We Failed to Make Clear in *Timley*

This court in *Wright* endorsed the language from *Kitchen* quoted in *Timley* as the "only choice" for ensuring jury unanimity as required by K.S.A. 22-3421. In so holding, the court overruled any contrary language in *Dixon*. *Wright*, 290 Kan. at 206. But *Wright* did not directly address *Timley*'s inconsistent citation to *Grissom*, nor did it reject or overrule *Grissom* and its adoption of *Griffin*. See *Wright*, 290 Kan. 204-06. Moreover, although *Wright* explicitly rejected *Dixon*'s application of harmless error, 290 Kan. at 206, the court ultimately held that there was sufficient evidence of both alternative means and there was *"no error* under the *Timley* alternative means rule." (Emphasis added.) 290 Kan. at 207. Because the *Wright* court found no error, it clearly did not need to reach the harmless error issue and I would hold that this aspect of *Wright* was dicta. And for this reason, I would accept the State's invitation to reconsider *Wright* and I would clarify *Wright*'s holding as follows.

### THIS COURT SHOULD ADOPT A MODIFIED HARMLESS ERROR APPROACH

First, I would reaffirm *Wright*'s determination that when a jury is instructed on alternative means of committing a crime, the State is required to present sufficient evidence of each means. And when sufficient evidence of each means is presented, we can affirm the conviction because, as we ultimately held in both *Timley* and *Wright*, if substantial evidence supported both means, jury unanimity is not in question. That is because regardless of which means the individual jurors considered, the State presented sufficient evidence from which " 'a rational trier of fact *could* have found each means of committing the crime beyond a reasonable doubt.' " *Timley*, 255 Kan. at 289 (quoting *Kitchen*, 110 Wash. 2d at 410).

But I would not, as *Wright* suggested in dicta, find that whenever there is insufficient evidence of *any* means, the conviction must be reversed. Instead, in order to determine whether there is a concern regarding our statutorily mandated requirement of jury unanimity, I would distinguish between two circumstances: (1) sufficient evidence of one means but *no* evidence of another; and (2) sufficient evidence of one means and *some*, but insufficient, evidence of another.

### 1. *Sufficient evidence of one means and no evidence of another*

When the first circumstance is present, *i.e.*, there is sufficient evidence of one means but *no* evidence of another means, we can affirm the conviction despite its contravention of *Wright*'s super-sufficiency requirement. In this circumstance, I would depart from the dicta in *Wright* and apply the *Griffin* rationale adopted by this court in *Grissom*—a rationale which was discussed but not specifically rejected by *Wright*. Simply said, when a jury is presented with *no* evidence of one means and sufficient evidence of another, we can reliably conclude the jury was not confused and that it unanimously decided the defendant's guilt based upon the *only* means for which there was evidence.

The vast majority of alternative means cases presented to this court can be resolved by simply considering whether there was sufficient evidence of both of the alleged means or sufficient evi-

dence of one alleged means and *no* evidence of another. See, *e.g.*, *Wright*, 290 Kan. at 205-06 (affirming rape conviction after finding sufficient evidence to establish that the victim was overcome by force or fear; noting that defendant did not challenge sufficiency of evidence to support alternative means that the victim could not consent because she was unconscious); *State v. Dixon*, 289 Kan. 46, 63-65, 209 P.3d 675 (2009) (*Dixon II*) (affirming felony-murder conviction after finding sufficient evidence to support each of three alternative means of committing the underlying felony of burglary); *State v. Stevens*, 285 Kan. 307, 314-19, 172 P.3d 570 (2007) (affirming conviction of driving under the influence after finding substantial evidence to support alternative means of operating under the influence and attempting to operate under the influence); *State v. Kesselring*, 279 Kan. 671, 684, 112 P.3d 175 (2005) (finding "no reason to doubt the jurors' unanimity regarding first-degree murder" when evidence was sufficient to support either premeditation or felony murder); *Dixon*, 279 Kan. at 606 (concluding it was harmless error to instruct jury on three alternative intents to support burglary charge when there was strong evidence of one means and *no* evidence of other means), *disapproved of by Wright*, 290 Kan. at 206; *State v. Morton*, 277 Kan. 575, 578-83, 86 P.3d 535 (2004) (affirming first-degree murder conviction after noting that defendant challenged only sufficiency of evidence to support premeditation and finding evidence sufficient to support premeditation); *State v. Hemby*, 264 Kan. 542, 551, 957 P.2d 428 (1998) (affirming aggravated criminal sodomy conviction after finding substantial evidence to support two alternative means of oral copulation; finding jury instruction that included third alternative means of anal copulation harmless when *no* evidence or argument was presented regarding anal copulation); *State v. Kelly*, 262 Kan. 755, 761-62, 942 P.2d 579 (1997) (affirming aggravated battery conviction after finding evidence could have supported a finding of guilt on any of the three alternative means upon which the jury was instructed); *State v. Alford*, 257 Kan. 830, 841-43, 896 P.2d 1059 (1995) (affirming aggravated kidnapping conviction after finding sufficient evidence to support alternatives of intent to facilitate flight and intent to facilitate commission of the crime of first-degree murder);

*Timley*, 255 Kan. at 290 (affirming multiple rape convictions after finding sufficient evidence to establish guilt "either by the means of force or by the means of fear").

Similarly, most of the alternative means cases decided by the Court of Appeals involve these circumstances. See, *e.g.*, *State v. Reed*, 45 Kan. App. 2d 372, 385-86, 247 P.3d 1074 (affirming aggravated robbery conviction after finding sufficient evidence to support both means upon which jury was instructed), *rev. denied* 292 Kan. 968 (2011); *State v. Dean*, 42 Kan. App. 2d 32, 44-45, 208 P.3d 343 (2009) (concluding it was harmless error to instruct on alternative means of committing child endangerment when there was ample evidence of one means and no evidence of other means), *rev. granted and remanded to dist. ct. in light of Wright*, 290 Kan. at 206; *State v. Smith*, 36 Kan. App. 2d 606, 615-16, 142 P.3d 739 (applying *Dixon*, finding harmless error when jury was instructed on alternative means of committing burglary and there was sufficient evidence to support one means but no evidence to support other means), *rev. denied* 282 Kan. 795 (2006); *State v. Thomas*, 28 Kan. App. 2d 655, 661-62, 20 P.3d 82 (applying *Griffin* and finding jury instruction not clearly erroneous when instruction included alternative means not provided for in the statute because there was no evidence of that means presented to the jury), *rev. denied* 271 Kan. 1041 (2001); *Johnson*, 27 Kan. App. 2d at 924-26 (following *Griffin/Grissom* rationale and affirming kidnapping conviction when there was sufficient evidence of two alternative means of kidnapping but no evidence of third means).

*2. Sufficient evidence of one means and some, but insufficient, evidence of another*

I would find that the rule enunciated in *Wright—e.g.*, that when there is insufficient evidence of at least one alternative means, the conviction must be reversed—comes into play only when there is sufficient evidence of one means and some, but insufficient, evidence of another means. In this circumstance, there is a possibility of jury confusion, and we cannot reliably conclude the State presented sufficient evidence from which a rational trier of fact could

have found each means of committing the crime beyond a reasonable doubt.

This circumstance was well demonstrated in *Ice*, 27 Kan. App. 2d 1. There, the defendant was convicted of rape after the jury was instructed it could convict if it found the sexual intercourse was committed without the consent of the victim because she was: (1) overcome by force or fear, or (2) physically powerless, or (3) incapable of giving consent because of mental deficiency or disease, which condition was known by or reasonably apparent to the defendant, or (4) incapable of giving valid consent because of the effect of any alcoholic liquor, which condition was known by or reasonably apparent to the defendant.

Applying *Timley*, the *Ice* panel found that although the prosecution had presented an expert witness regarding the victim's mental capability, the expert had not established that the victim was incapable of giving consent because of her mental deficiency or disease. Instead, the expert had essentially established that the victim had difficulty comprehending the consequences of her behavior. 27 Kan. App. 2d at 5-6. Thus, the panel concluded that "[a]t least one means, that of mental deficiency, was not proven by sufficient evidence." *Ice*, 27 Kan. App. 2d at 6. But the *Ice* panel refused to apply *Griffin*, instead reasoning:

> "In the instant case, we have no idea whether the jury found Ice guilty of rape due to force and fear being used, or due to a lack of capacity of the victim to consent, or a combination of the two. This case differs from those where there was strong evidence supporting one theory and none on another, such as in *Griffin*. In a *Griffin* situation, *one can reasonably assume the jury did not behave capriciously and convict on a theory in which there was no evidence, when there was strong evidence supporting another theory.*
>
> "With so much testimony and prosecutorial effort invested in the 'no capacity' theory, we cannot say that there is no real possibility that the verdict here was based only on the force and fear theory. We must therefore reverse and remand for a new trial." (Emphasis added.) 27 Kan. App. 2d at 7.

Another example of this circumstance is *State v. Jones*, 96 Hawaii 161, 29 P.3d 351 (2001). There, the State presented "considerable argument" and "some," legally insufficient evidence regarding two grounds of ineffective consent in a sexual assault case; but the Hawaii Supreme Court reversed the defendant's convictions, finding

that the jury may have returned a verdict based on legally insufficient grounds. 96 Hawaii at 181-83. Citing *Ice*, the Hawaii court reasoned,

"We are not convinced by the reasoning of the Supreme Court in *Griffin* that the jury will necessarily reject a theory unsupported by legally sufficient evidence, particularly where there is some evidence adduced and considerable argument presented to the jury. However, we recognize, as did the Kansas Court of Appeals, that, where there is no real possibility that the jury convicted based on an unsupported theory, *e.g.*, where there is overwhelming evidence of one theory and absolutely no argument or evidence presented on another, there may be no reversible error. *See Ice*, 997 P.2d at 741." *Jones*, 96 Hawaii at 181.

Like the Court of Appeals panel in *Ice* and the Hawaii Supreme Court in *Jones*, I would distinguish the United States Supreme Court's holding in *Griffin* in this circumstance. Specifically, I would find that when there is some, but insufficient, evidence of one means, we cannot say beyond a reasonable doubt that there is no reasonable possibility that the error contributed to the verdict. In that circumstance, I would apply *Wright*'s insufficiency rule and reverse the conviction for insufficient evidence. But I would clarify *Wright* to make clear that the insufficient evidence rule does not apply to cases in which there was *no* evidence of one means and thus no possibility of jury confusion. In that circumstance, I would apply a modified harmless error approach.

### 3. *Modified Harmless Error Approach*

This approach essentially applies a modified harmless error analysis, which seems appropriate in alternative means cases. In analyzing alternative means cases, we blend concepts of sufficiency of the evidence, which is not subject to a harmless error analysis, with instructional error, which is subject to a harmless error analysis.

To this end, I would refine our suggestion in *Wright* that an insufficiency error " 'cannot be harmless because it means the State failed to meet its burden of proving the defendant guilty beyond a reasonable doubt.' " 290 Kan. at 205 (quoting Beier, 44 Washburn L.J. at 299). The problem with this statement is that while we generally do not apply a harmless error analysis when evidence is insufficient to support a charge, alternative means cases are not "pure" insufficiency cases because the jury also was instructed on

a means for which there *was* sufficient evidence. Moreover, these cases also involve instructional error—*i.e.*, the jury was instructed on a "means" that either has no factual support or has insufficient factual support.

I would find that an insufficiency error in an alternative means case *can* be harmless if *no* evidence was presented regarding one means but sufficient evidence was presented of another means. However, an insufficiency error cannot be harmless when some, but insufficient, evidence and/or argument was presented to the jury regarding one means, as the jury may understandably have applied the insufficient facts to the law and convicted the defendant upon an insufficient means.

### 4. *Application of modified test to this case*

Ultimately, application of a modified harmless error approach would lead me to reject Brown's alternative means challenges in a very straightforward fashion—based on Brown's own argument.

Brown challenges his conviction for aggravated indecent liberties with a child, on which the jury was instructed "[t]hat the defendant fondled or touched the person of [G.V.] in a lewd manner, with the intent to arouse or satisfy the sexual desires *of either* [*G.V.*], *or the defendant, or both*." (Emphasis added.) Brown concedes there was circumstantial evidence of his intent to satisfy his own sexual desires but argues there was *no* evidence that he intended to arouse or satisfy the sexual desires of G.V. or both he and G.V.

Brown also challenges the instruction for lewd and lascivious behavior, which required the State to prove that Brown "exposed his sex organ in the presence of a person not his spouse and who had not consented thereto, with the intent to arouse or to gratify the sexual desires *of the defendant or another*." (Emphasis added.) Brown again argues that while there may be circumstantial evidence of his intent to arouse his own sexual desires, there was *no* evidence he intended to satisfy the sexual desires of another.

Since Brown concedes there was no evidence of either of the alleged "means" he challenges, I would simply find that even if the challenged instructional language did set out alternative means,

there was no chance of jury confusion and the convictions should be affirmed.