NOT DESIGNATED FOR PUBLICATION

No. 119,428

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

RONALD E. THRONE,
*Appellant*.


MEMORANDUM OPINION

Appeal from Douglas District Court; BARBARA KAY HUFF, judge. Opinion filed June 5, 2020. Affirmed.

*Kai Tate Mann*, of Kansas Appellate Defender Office, for appellant.

*Kate Duncan Butler*, assistant district attorney, *Charles E. Branson*, district attorney, and *Derek Schmidt*, attorney general, for appellee.


Before HILL, P.J., GREEN and WARNER, JJ.


PER CURIAM: In May 2016, Ronald Throne spent several hours with T.C., a 15-year-old girl. Several days later, T.C. told police Throne had exposed himself, inappropriately touched her, and sent her sexual text messages and a video. The State charged Throne with multiple crimes, and a jury found him guilty of all charges. Throne was sentenced to 322 months in prison, followed by lifetime postrelease supervision. Having carefully reviewed Throne's multiple arguments on appeal, we affirm his convictions.

FACTUAL AND PROCEDURAL BACKGROUND

On May 26, 2016, a storm rolled through Lawrence, snapping branches and downing a tree across Arkansas Street. That afternoon, about 20 residents of a trailer park worked together to clear the debris. Among those who came were T.C., a 15-year-old girl, and Throne, a maintenance worker at the park. During that day, T.C. and Throne spent time in a white truck, Throne's brown truck, and Throne's trailer. Their activities formed the basis of Throne's six criminal charges: two counts of aggravated indecent liberties with a child; one count of electronic solicitation; one count of indecent liberties with a child; one count of lewd and lascivious behavior; and one count of promoting obscenity to minors. Although the parties contest what occurred, they agree on the sequence of events.

Because it was raining, Throne let T.C. sit in a white truck owned by the trailer park. Although the truck was not parked in the center of the clean-up effort—it was four or five trailers away—a few people were near the truck. In the truck, Throne entered his phone number into T.C.'s cell phone, which she saved under the name "My New Friend." According to T.C., Throne asked her age when she entered the white truck; she replied she was 15. Throne then pulled down his pants and boxers and began masturbating and kissing T.C. Throne stopped when the trailer park's owner walked to his car, which was parked nearby. Despite her requests, Throne would not let T.C. leave.

Throne and T.C. sat in the white truck for 45 minutes to an hour until another maintenance worker, whose truck was stuck in the mud, asked Throne to help pull the truck free. T.C. and Throne drove to Throne's trailer to retrieve his brown truck, which they drove back to the clean-up effort. After driving to retrieve his brown truck, Throne told T.C. not to tell anyone what had happened.

Once inside Throne's truck, Throne asked T.C. to kiss him. When she refused, he forced her to kiss him and grabbed her breast by reaching down her shirt. While driving back to the clean-up effort, Throne stopped the truck, lifted T.C.'s dress, and inserted his fingers into her vagina. They eventually reached the clean-up effort, and Throne helped pull the maintenance worker's truck free.

Later that evening, T.C., her sister, and a friend went over to Throne's trailer to play video games. While T.C.'s sister and friend played in the front room, Throne digitally penetrated T.C. again in the kitchen. He stopped when a dog began barking, and they returned to the front room. Throne also sent several text messages to T.C. that evening, including "Where is my naked pictures go to my bathroom and take some," "Suck me," "I want to take your virginity," and a 39-second video of a man masturbating. After spending several hours at Throne's trailer, T.C. returned home.

Several days later, T.C.'s mother called the police after T.C. told her about the video and text messages. When the responding officer asked if anything else had occurred, T.C. told him about the other instances. Police subsequently interviewed Throne. During the interview, Throne stated the touching was consensual, but he denied digitally penetrating T.C. He also stated he inadvertently sent the messages and video to her. Finally, Throne believed T.C. was 18 years old; he learned her real age the next day.

The State charged Throne with five felonies—two counts of aggravated indecent liberties with a child for the two instances of digital penetration; one count of electronic solicitation associated with his text messages; one count of indecent liberties with a child; one count of lewd and lascivious behavior for masturbating in the white truck—and one misdemeanor for promoting obscenity to minors (sending T.C. the video). At trial, Throne reiterated he did not digitally penetrate T.C., but he also recanted his interview statements, denying ever touching her.

The jury convicted Throne on all charges. Because Throne had two previous convictions for aggravated indecent solicitation of a child, the court found him to be a persistent sex offender under K.S.A. 2015 Supp. 21-6804(j). The court therefore entered a controlling sentence of 322 months in prison (determined by his two convictions for aggravated indecent liberties with a child), followed by lifetime postrelease supervision.

DISCUSSION

1. *Indecent liberties with a child, as defined by K.S.A. 2015 Supp. 21-5506(a)(1), is not a lesser included offense of aggravated indecent liberties with a child under K.S.A. 2015 Supp. 21-5506(b).*

Throne first claims he should be granted a new trial because the district court did not properly instruct the jury concerning the law on aggravated indecent liberties with a child. He asserts the court should have instructed the jury that indecent liberties with a child under K.S.A. 2015 Supp. 21-5506(a)(1) is a lesser included offense of aggravated indecent liberties with a child under K.S.A. 2015 Supp. 21-5506(b). At first glance, Throne's argument has some rhetorical appeal—aggravated indecent liberties with a child *sounds* like it is a more serious version of indecent liberties with a child. But Throne's proposed instruction would have been legally inappropriate; offenses under K.S.A. 2015 Supp. 21-5506(a)(1) are not lesser included offenses of aggravated indecent liberties with a child under K.S.A. 2015 Supp. 21-5506(b).

As a preliminary matter, Throne did not ask the district court to provide the lesser included offense instruction he now advocates. In such circumstances, appellate courts will only remand for a new trial if the absence of the instruction in question was clearly erroneous. K.S.A. 2019 Supp. 22-3414(3). "Clearly erroneous" is not a standard of review; instead, "it supplies a basis for determining if an error requires reversal." *State v. Lewis*, 299 Kan. 828, Syl. ¶ 11, 326 P.3d 387 (2014). We apply a two-step process in determining whether the omission of a jury instruction was clearly erroneous. *State v. Cruz*, 297 Kan. 1048, Syl. ¶ 5, 307 P.3d 199 (2013). When the issue is properly before us,

4

we consider first whether the instruction in question is legally and factually appropriate. See *State v. Soto*, 301 Kan. 969, Syl. ¶ 9, 349 P.3d 1256 (2015). If the instruction was appropriate, then we consider whether the failure to provide that instruction was reversible—that is, whether this court is firmly convinced that the instruction would have made a difference in the verdict. *State v. Haberlein*, 296 Kan. 195, Syl. ¶ 1, 290 P.3d 640 (2012), *cert. denied* 571 U.S. 860 (2013).

The State argues that we need not reach the merits of Throne's request, claiming Throne invited the error he now claims is reversible. The State points to an exchange between the district court and Throne's counsel at trial. Before providing the instructions to the jury, the court noted Throne had previously "talked about lesser[]" included offenses and confirmed that he was not requesting a lesser included offense instruction. Throne's counsel responded, "Yeah."

It is true that appellate courts generally decline to review challenges by a party when he or she requested—or invited—the action now claimed to be error. The invited-error rule only applies, however, when a defendant "actively pursues what is later argued to be an error." *State v. Sasser*, 305 Kan. 1231, 1236, 391 P.3d 698 (2017). It does not apply when a party fails to request an instruction or acquiesces to a ruling, as Throne did here. See 305 Kan. at 1235-36.

We thus proceed to consider whether it would have been legally appropriate to provide the instruction Throne proposes—a question of law over which our review is unlimited. *Soto*, 301 Kan. 969, Syl. ¶ 9. At the outset, we note that another panel of our court has previously held indecent liberties with a minor is not a lesser included offense of aggravated indecent liberties with a minor. *State v. Glover*, No. 117,140, 2018 WL 3400762 (Kan. App. 2018) (unpublished opinion), *rev. denied* 309 Kan. 1351 (2019). While we are not bound by that panel's decision, we reach the same conclusion.

Under Kansas law, a lesser included offense is a "lesser degree of the same crime" (K.S.A. 2019 Supp. 21-5109[b][1]) or "a crime where all elements of the lesser crime are identical to some of the elements of the crime charged" (K.S.A. 2019 Supp. 21-5109[b][2]). This statute thus provides alternative avenues for analyzing whether a particular crime is a lesser included offense:

- Subsection (b)(1) requires courts to consider whether an offense is a "lesser degree" of the "same crime." K.S.A. 2019 Supp. 21-5109(b)(1). "Lesser degree" requires an examination of whether the grade of the offense is "'more or less culpable than another grade.'" *State v. Ramirez*, 299 Kan. 224, 230, 328 P.3d 1075 (2014) (quoting 21 Am. Jur. 2d, Criminal Law § 19, p. 132). "Same crime" incorporates various factors such as the gravamen of the two crimes, how the crimes were treated at common law, and statutory history and structure. See 299 Kan. at 231-32.

- Subsection (b)(2) codifies the strict elements test, where courts compare the statutory elements of each crime without looking to the underlying facts. *State v. Alderete*, 285 Kan. 359, Syl. ¶ 2, 172 P.3d 27 (2007).

Neither of these sections applies here. K.S.A. 2019 Supp. 21-5506 criminalizes indecent liberties with a child, providing in relevant part:

> "(a) Indecent liberties with a child is engaging in any of the following acts with a child who is 14 or more years of age but less than 16 years of age:
>> (1) Any lewd fondling or touching of the person of either the child or the offender, done or submitted to with the intent to arouse or to satisfy the sexual desires of either the child or the offender, or both; or
>> . . . .
> "(b) Aggravated indecent liberties with a child is:

6

> (1) Sexual intercourse with a child who is 14 or more years of age but less than
> 16 years of age."

"Sexual intercourse" encompasses "any penetration of the female sex organ by a finger, the male sex organ or any object. Any penetration, however slight, is sufficient to constitute sexual intercourse." K.S.A. 2019 Supp. 21-5501(a).

A review of this statute reveals indecent liberties with a child under K.S.A. 2019 Supp. 21-5506(a) does not contain all the elements of aggravated indecent liberties with a child under K.S.A. 2019 Supp. 21-5506(b)(2). Subsection (a) contains a mens rea requirement—the intent to arouse or to satisfy the sexual desires—not contained in the aggravated version. Our Supreme Court has come to an analogous conclusion when comparing two similar statutes applied to children younger than 14 years old. *State v. Belcher*, 269 Kan. 2, 7-8, 4 P.3d 1137 (2000) (aggravated indecent liberties is not a lesser included offense of rape; indecent liberties contains additional elements that rape does not). Thus, indecent liberties with a child is not a lesser included offense under the strict-elements test. See K.S.A. 2019 Supp. 21-5109(b)(2).

Nor is indecent liberties with a child a lesser degree of the same crime as aggravated indecent liberties with a child. See K.S.A. 2019 Supp. 21-5109(b)(1). First, the gravamen of the two offenses are different. Indecent liberties with a child under K.S.A. 2019 Supp. 21-5506(a)(1) prohibits touching while the aggravated version under K.S.A. 2019 Supp. 21-5506(b)(1) criminalizes vaginal penetration. These are markedly different acts.

And the organization of sex crimes in Article 55 of the Kansas Statutes does not indicate that indecent liberties is a lesser included offense of its aggravated counterpart. Sex offenses are classified based on the sexual act and the victim's age. There are three types of acts: touching; sexual intercourse; and sodomy. See K.S.A. 2019 Supp. 21-

7

5501(a)-(b). Similarly, victims are divided into three groups by age: victims less than 14 years old; 14- or 15-year-old victims; and victims 16 years old or older.

Touching and sexual intercourse with a 14- or 15-year-old victim are criminalized in the same statute as non-aggravated and aggravated indecent liberties with a child, respectively. K.S.A. 2019 Supp. 21-5506(a)(1), (b)(1). But other age groups are addressed in different statutes. When the victim is younger than 14 years old, touching and sexual intercourse are criminalized as aggravated indecent liberties and rape, respectively. K.S.A. 2019 Supp. 21-5506(b)(3)(A); K.S.A. 2019 Supp. 21-5503(a)(3). When the victim is 16 years old or older, touching and sexual intercourse are criminalized as sexual battery and rape, respectively. K.S.A. 2019 Supp. 21-5505(a)-(b); K.S.A. 2019 Supp. 21-5503(a)(1)-(2) (describing when a victim succumbs under certain circumstances). And sodomy, regardless of the victim's age, is classified in its own statute. K.S.A. 2019 Supp. 21-5504 (a)(3), (b)(1), (b)(3) (14- or 15-year-old victims, victim less than 14 years old, and when victims succumb under certain circumstances).

As this discussion indicates, a non-aggravated crime is not always a lesser degree of the aggravated version, even when both are placed in the same statute. Rather, these crimes are classified in a number of ways, including the victim's age and the type of sexual activity. In such circumstances, it makes more sense to determine whether one crime is a lesser included offense of another by comparing the elements of each crime under K.S.A. 2019 Supp. 21-5109(b)(1).

Because indecent liberties with a child is not a lesser included offense of aggravated indecent liberties with a child, it would have been legally inappropriate to provide a jury instruction for indecent liberties with a child. The district court did not err when it did not provide that instruction to the jury.

2. *The evidence is sufficient to support Throne's conviction for lewd and lascivious behavior.*

Throne next challenges his conviction for lewd and lascivious behavior, claiming the State did not present sufficient evidence to convict him of that offense.

Courts entrust juries with the important work of hearing the evidence and determining whether, in a criminal case, the State has met its burden of proving beyond a reasonable doubt that the defendant committed the charged offense. To carry out this critical role, jurors—who have heard the witnesses' testimony and observed their demeanor—assess witnesses' credibility and weigh the evidence presented. Appellate judges, who were not present at trial, give deference to these observations. For this reason, when reviewing sufficiency of the evidence, we will uphold a conviction if we are convinced, after reviewing the evidence in a light most favorable to the State, "a rational factfinder could have found the defendant guilty beyond a reasonable doubt." *State v. Chandler*, 307 Kan. 657, Syl. ¶ 2, 414 P.3d 713 (2018). We do "not reweigh evidence, resolve evidentiary conflicts, or reassess witness credibility." 307 Kan. 657, Syl. ¶ 2.

The State charged Throne with lewd and lascivious behavior under K.S.A. 2015 Supp. 21-5513(a)(2), associated with his conduct of exposing himself and masturbating while in the white maintenance truck. To prove Throne engaged in this conduct, the State was required to show he "publicly expos[ed] a sex organ . . . with intent to arouse or gratify the sexual desires of the offender or another." K.S.A. 2015 Supp. 21-5513(a)(2).

Throne claims the State failed to prove he "publicly" exposed himself, relying on dictionary definitions defining "publicly" as "[i]n a public or open manner or place" and "public" as "[o]f, relating to, or affecting a population or a community as a whole." Since he exposed himself only to T.C. and the truck was removed from those engaged in the clean-up effort, he claims his exposure did not involve the community as a whole or contemplate a broader audience than T.C.

9

The State first argues the mere fact that Throne exposed himself to T.C. was sufficient to support a lewd and lascivious behavior conviction. That might be true if Throne were charged with an alternate avenue of defining lewd and lascivious behavior under K.S.A. 2015 Supp. 21-5513(a)(2)—exposure in the presence of a nonconsenting person other than a spouse. See *State v. Sawyer*, No. 101,062, 2009 WL 4639488, at *1 (Kan. App. 2009) (unpublished opinion), *rev. denied* 290 Kan. 1102 (2010). But Throne correctly points out that the district court did not instruct the jury on that crime; it only instructed on public exposure. We must therefore consider whether the evidence presented at trial was sufficient to demonstrate Throne "publicly expos[ed]" himself while he was in the maintenance truck.

In addressing this question, both parties rely heavily on this court's interpretation of "publicly" in *State v. Albin*, No. 114,712, 2016 WL 6651871 (Kan. App. 2016) (unpublished opinion). In *Albin*, the defendant, a truck driver, pulled his commercial truck into an office parking lot; there were no pedestrians in the parking lot, and the defendant parked at least 40 feet from the nearest car. While the defendant masturbated in the truck, a security guard, using one of the office's security cameras, zoomed in on the truck's windshield. Although the footage showed nothing obscene, the guard informed the police, and the defendant was arrested. He was later found guilty of lewd and lascivious behavior at a bench trial.

This court reversed. Relying on the definition of "public" in Black's Law Dictionary, which reads "'[t]he people of a country or community as a whole,'" the court rejected the argument that "publicly" means "in a public place"; the legislature had previously removed "in a public place" language from the statute. 2016 WL 6651871, at *3 (quoting Black's Law Dictionary 1422 [10th ed. 2014]). Rather, the statute "requires foreseeability that one's acts may be seen by another." 2016 WL 6651871, at *4. This analysis is fact-dependent; it turns on the time, place, and manner of the act. 2016 WL

10

6651871, at *5. Because the defendant was parked away from other cars (and in a heightened truck), no pedestrians were in the parking lot at the time, and even the security guard could not see clearly into the truck, the *Albin* court found the defendant did not publicly expose himself. 2016 WL 6651871, at *4-5.

We find *Albin*'s discussion of the fact-specific nature of "public exposure" persuasive. When jurors are instructed that an offense requires a public act, they are called on to listen to the evidence, consider the facts, and determine whether, in their practical experience, the State proved public conduct. Here, the State presented evidence from which the jury could draw that conclusion. Throne masturbated in a maintenance truck in the midst of a clean-up effort when multiple people were nearby. The truck was parked near other cars, requiring others—including another maintenance worker—to pass by the truck; Throne covered himself only after the trailer park's owner went to his nearby car. It was reasonably foreseeable that a person could have seen Throne while he was masturbating in the truck. Under these facts, there was sufficient evidence presented to support Throne's conviction for lewd and lascivious behavior.

3. *Sufficient evidence supports Throne's conviction for promoting obscenity.*

In addition to his five felony convictions, the jury found Throne guilty of promoting obscenity to minors, a misdemeanor. K.S.A. 2015 Supp. 21-6401 defines promoting obscenity as recklessly "[m]anufacturing, mailing, transmitting, publishing, distributing, presenting, exhibiting or advertising any obscene material or obscene device." K.S.A. 2015 Supp. 21-6401(a)(1). The statute defines promoting obscenity to minors as "promoting obscenity, as defined in subsection (a), where a recipient of the obscene material or obscene device . . . is a child under the age of 18 years." K.S.A. 2015 Supp. 21-6401(b). The statute indicates "'material' means any tangible thing which is capable of being used or adapted to arouse interest, whether through the medium of reading, observation, sound or other manner." K.S.A. 2015 Supp. 21-6401(f)(2).

11

The State asserted Throne had transmitted obscene material within the meaning of K.S.A. 2015 Supp. 21-6401(a)(1) and (b) when he sent T.C. the video of a person masturbating. On appeal, Throne brings two challenges to the sufficiency of the evidence for this conviction: Throne first contends the statute's prohibition of transmitting "any obscene material or obscene device" creates alternative means of promoting obscenity. Alternatively, he argues that the statute only prohibits sending "tangible thing[s]," and the video he sent T.C. was not "tangible," but digital.

3.1. *K.S.A. 2015 Supp. 21-6401(a)(1) does not create alternative means of promoting obscenity to minors.*

The court instructed the jury that, to find Throne guilty of promoting obscenity to a minor, it must find "[t]he defendant recklessly transmitted obscene material or an obscene device." Throne argues that this language, which substantially mirrors K.S.A. 2015 Supp. 21-6401(a)(1), creates alternative means of promoting obscenity to minors. According to Throne, this language required the State to submit evidence that he transmitted both obscene material *and* an obscene device; otherwise, we have no way of knowing whether a jury unanimously convicted him of the crime charged. We do not find Throne's argument persuasive.

A jury must unanimously agree the defendant committed the charged crime before it can find a defendant guilty of that offense. See K.S.A. 22-3421; *State v. Wright*, 290 Kan. 194, Syl. ¶ 1, 224 P.3d 1159 (2010) ("Jury unanimity on guilt in a criminal case is statutorily required in Kansas."). This is straightforward when a crime can only be committed one way. Some crimes, however, can be committed in multiple ways—that is, there are alternative means of committing the crime. See *State v. Brown*, 295 Kan. 181, 192, 284 P.3d 977 (2012). For alternative-means crimes, "[u]nanimity is not required . . . as to the means by which the crime was committed so long as substantial evidence supports each alternative means." 295 Kan. 181, Syl. ¶ 1.

12

Yet not every statute that contains different methods of committing an offense gives rise to an alternative-means crime. While statutes usually create alternative means by using "or," courts must examine why the legislature used the disjunctive to determine whether alternative means exist. 295 Kan. 181, Syl. ¶¶ 4, 7. Language creating alternative means generally addresses "essential, distinct elements" of mens rea, the act requirement, or causation. 295 Kan. at 194. Language "describing a material element or a factual circumstance that would prove the crime," however, does not create alternative means of committing that crime; instead, it provides *options* for committing a crime *within a means*, which do not require jury unanimity. 295 Kan. at 194, 196-97.

Courts consider a number of other indicators to help differentiate *alternative means* from *options within a means*. For example, courts have observed that the legislature generally places alternative-means provisions in different subsections of the same statute. 295 Kan. at 196. But definitional provisions that describe a material element of the crime (not the crime itself) generally do not create alternative means. 295 Kan. at 198. Likewise, provisions describing "factual circumstances that may prove the crime" generally create options within a means of committing the crime. 295 Kan. at 199.

Whether a statute creates alternative means is a question of statutory interpretation reviewed de novo; since it involves the sufficiency of the evidence, an alternative-means challenge may be raised for the first time on appeal. *State v. Eddy*, 299 Kan. 29, 32-33, 321 P.3d 12 (2014).

Applying these principles here, we conclude K.S.A. 2015 Supp. 21-6401(a)(1)'s "obscene material or obscene device" language creates options within a means, not an alternative means of committing that crime. The language does not describe an essential, distinct element of the offense. The statute requires a reckless intent; the requisite act is any of the eight verbs listed in K.S.A. 2015 Supp. 21-6401(a)(1). The statute's reference to "any obscene material or obscene device" describes a factual circumstance that would

13

result in criminal liability. Thus, obscene "material" and "device" are options within a means of committing that crime.

3.2. *The State presented sufficient evidence that Throne transmitted a tangible thing to T.C., as required by K.S.A. 2015 Supp. 21-6401(a)(1) and (f)(2).*

Throne also argues the State failed to present any evidence that he transmitted "any obscene material or obscene device" to T.C. The State acknowledges it did not present evidence that Throne sent T.C. an obscene device. But it argues the digital video Throne sent to T.C.'s phone was obscene material within the meaning of K.S.A. 2015 Supp. 21-6401. Our resolution of this question turns on our interpretation of this statute— we must determine what the legislature intended to encompass when it defined "material" as "any tangible thing" in K.S.A. 2015 Supp. 21-6401(f)(2).

In general, this court will reverse a conviction for insufficient evidence only when we conclude, viewing the evidence in the light most favorable to the State, that a rational jury could not have found the defendant guilty beyond a reasonable doubt. See *Chandler*, 307 Kan. 657, Syl. ¶ 2. But our review takes on a different dimension when, as here, a defendant's claim turns on a question of statutory interpretation. Interpretation of a statute is a question of law over which appellate courts have unlimited review. *State v. Keel*, 302 Kan. 560, Syl. ¶ 4, 357 P.3d 251 (2015).

The aim of statutory interpretation is to determine the legislature's intent based on the language it employed. 302 Kan. 560, Syl. ¶ 5. When a statute's text is plain and unambiguous, courts apply the language as written and do not look to canons of construction or legislative history. We give common words their common meanings and neither add language nor read out statutory requirements. 302 Kan. 560, Syl. ¶ 6.

When a statute's language is ambiguous, courts employ various tools of construction to ascertain the legislature's intent. For example, courts consider the

14

uncertain language within the greater context of the entire statute's text, or the text of an entire act, as a whole, with an eye toward reading provisions in workable harmony, if possible. 302 Kan. 560, Syl. ¶ 7. We also presume the legislature does not enact meaningless legislation or employ meaningless language. *State v. Frierson*, 298 Kan. 1005, 1013, 319 P.3d 515 (2014). As a corollary of this principle, courts presume that by choosing to include certain language in statutes, the legislature necessarily decided not to include other alternative text. See *State v. Martin*, 285 Kan. 735, 741-42, 175 P.3d 832 (2008) (discussing *expressio unius est exclusio alterius*: the inclusion of one thing implies the exclusion of another).

These principles guide our interpretation of K.S.A. 2015 Supp. 21-6401. The legislature, in enacting this statute, decided to define "material" as "any tangible thing." K.S.A. 2015 Supp. 21-6401(f)(2). The question before us is whether this definition includes *digital* information, such as the video transmitted by Throne.

As the parties note, "tangible" has several meanings. Black's Law Dictionary defines "tangible" as (1) "Having or possessing physical form; CORPOREAL"; (2) "Capable of being touched and seen; perceptible to the touch; capable of being possessed or realized"; or (3) "Capable of being understood by the mind." Black's Law Dictionary 1757 (11th ed. 2019). Each of these definitions emphasizes a different aspect of what it could mean to be "tangible." The first addresses an item's *physicality*; the second its *perceivability*; and the third its *comprehensibility*. See also *People v. Aleynikov*, 31 N.Y.3d 383, 398, 104 N.E.3d 687 (2018) (discussing various definitions of tangible as meaning "real," "substantial," or "objective").

K.S.A. 2015 Supp. 21-6401(f)(2) does not expressly indicate whether the legislature intended for any or all of these definitions of tangible to apply, but our canons of construction help discern that legislative intent. The Kansas Legislature first included "tangible" in its definition of material 50 years ago when K.S.A. 21-6401's predecessor

15

statute was enacted. L. 1969, ch. 180, § 21-4301(2)(b). At that time, long before the explosion of digital information and technologies we are accustomed to today, people encountered obscene materials through different forms of media. But when the legislature re-codified the Kansas criminal code in 2010—in the age of wireless Internet, streaming videos, and smartphones—it continued to include "tangible" in defining material subject to the statute. See L. 2010, ch. 136, § 212. In light of this history, we reject the notion that "tangible" is merely a holdover descriptor from an era predating modern technology.

Instead, the language surrounding "tangible" within K.S.A. 2015 Supp. 21-6401(f)(2) demonstrates the legislature intended the statute to be read broadly. The statute encompasses "*any* tangible *thing*" that arouses interest "through the medium of reading, observation, sound *or other manner*." (Emphases added.) K.S.A. 2015 Supp. 21-6401(f)(2). Its predecessor, K.S.A. 1961 Supp. 21-1102(a), applied to "any book, magazine, newspaper, writing, pamphlet, ballad, printed paper, print, picture, drawing, photograph, publication or other thing" containing "lewd or lascivious language, . . . prints, pictures, figures or descriptions." While this list is extensive, K.S.A 2015 Supp. 21-6401(f)(2) further expanded its reach by defining material in terms of how it may be perceived rather than through an inventory of covered items.

A panel of this court recently concluded that digital photographs and videos sent via Snapchat fell within the definition of obscene "material" under K.S.A. 2015 Supp. 21-6401(f)(2). See *State v. Johnson*, 56 Kan. App. 2d 1293, 1316, 447 P.3d 1010 (2019), *rev. denied* 311 Kan. __ (February 27, 2020). In *Johnson*, the court rejected the argument that "tangible" refers only to "three-dimensional physicality or touchability." 56 Kan. App. 2d at 1314. Instead, the court similarly reasoned that, reading K.S.A. 2015 Supp. 21-6401 as a whole, the legislature intended to criminalize the sending of digital information because it included "transmit[ting]" obscene material as a means of promoting obscenity under K.S.A. 2015 Supp. 21-6401(a)(1). 56 Kan. App. 2d at 1316.

Other courts across the country have similarly held in multiple contexts that "tangible" items include digital media. See, e.g., *Aleynikov*, 31 N.Y.3d at 386 (concluding that tangible information can include digital material and contrasting this information with intangible ideas); *State v. Stone*, 137 S.W.3d 167, 176 (Tex. App. 2004) (concluding digital photos were "tangible" because they could be viewed, i.e. sensed visually); *Dynamic Digital Design, Inc. v. Commissioner of Revenue*, No. 7380-R, 2004 WL 97645, at *3 (Minn. Tax 2004) (unpublished opinion) (concluding digital files fell within the definition of "tangible personal property"); see also *American Multi-Cinema, Inc. v. City of Aurora*, No. 18CA2165, 2020 WL 34677, at *1 (Colo. App. 2020) (unpublished opinion) (noting AMC acknowledged on appeal that digital movie files "are tangible personal property").

While we are not bound by *Johnson*'s reasoning, we come to a similar conclusion. The breadth of the legislature's definition of "material" in K.S.A. 2015 Supp. 21-6401(f)(2), its inclusion of various methods of perception beyond touch (such as "observation" and "sound"), and its recognition and inclusion of transmission as a method of sending obscene material all demonstrate it did not intend "tangible" to be read narrowly—as capable of being physically touched—but broadly. We conclude the statute's "tangible" language encompasses not only physical objects but something substantial or real—capable of being perceived—as opposed to an intangible idea or thought. Digital media fall into this definition; though digital files cannot be "touched" in a tactile sense, they can certainly be perceived through sight and sound. Thus, digital media are "tangible" things within the meaning of K.S.A. 2015 Supp. 21-6401(f)(2).

Based on this discussion, there can be no question the video Throne sent to T.C. falls within the reach of K.S.A. 2015 Supp. 21-6401. And Throne does not contend the evidence was in any other way deficient to support his conviction. Sufficient evidence was presented at trial to support Throne's conviction for promoting obscenity to a minor.

4. *The prosecutor did not commit reversible error during closing argument.*

Throne claims the State committed prosecutorial error during its closing argument by impermissibly shifting the burden of proof to him when the prosecutor commented on Throne's lack of corroborating witnesses. But even if we were to find that the State exceeded its permissible latitude, this error would not be reversible.

During his closing argument, Throne noted the State did not call several people—T.C.'s sister, friend, Throne's girlfriend, and a friend of his girlfriend—who were present at Throne's trailer around the time when T.C. claimed the second digital penetration occurred. Throne asserted that without these other witnesses' testimony, the jury was left with only T.C.'s explanation of the event—an account Throne argued was unreliable in light of various inconstancies in T.C.'s conduct and statements. In its rebuttal, the State made the following argument:

> "[The State]: Now, the defense wants you to look at why didn't you hear from all these other people? Ladies and gentlemen, what would those other people have told you?
> "The State has subpoena power, but so does the defense, and the defense called witnesses. The defense called the defendant. If those individuals had something to say that those acts didn't occur, would the defense have called them?"

Throne objected to this line of argument, asserting it was the State—not Throne—who bore the burden of proof. After the court sustained Throne's objection, the prosecutor continued with the State's rebuttal:

> "[The State]: Ladies and gentlemen, those witnesses would have told you one of two things, if they testified: They would have told you what was consistent with what— [T.C.'s] statement, and the defendant's statement, that no one saw any of this that went on. Or they could have told you that they saw it occurred.
> "So looking at the evidence, the evidence presented, did the State, using that evidence, prove its case beyond a reasonable doubt? That is your job, and that is what you are to do in this case."

On appeal, Throne claims this argument was improper in two respects. First, he again asserts that the prosecutor attempted to shift the burden of proof to Throne by implying he had an obligation to present his own evidence. Second, he argues the State impermissibly argued facts not in evidence by surmising the uncalled witnesses could only have testified about two issues—whether they did or did not see the digital penetration in Throne's trailer. Rather, Throne reasons, they could have offered other explanations such as T.C. never went into the kitchen. Accord *State v. Stimec*, 297 Kan. 126, 128, 298 P.3d 354 (2013) (prosecutor cannot comment on facts not in evidence).

The Due Process Clause of the Fourteenth Amendment to the United States Constitution guarantees a right to a fair trial. *State v. Sherman*, 305 Kan. 88, 98, 378 P.3d 1060 (2016). To protect that right, the Fourteenth Amendment imposes certain restrictions on prosecutors. See 305 Kan. at 98. A prosecutor commits prosecutorial error by exceeding those limitations. 305 Kan. at 109. When sufficiently severe, these errors render a trial unfair, depriving a criminal defendant of his or her right, and warrant reversal of the defendant's convictions. See 305 Kan. at 99.

An appellate court's review of a claim of prosecutorial error involves a two-step process: consideration of error and consideration of prejudice. 305 Kan. at 109. In considering whether error has occurred, "the appellate court must decide whether the prosecutorial acts complained of fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial." 305 Kan. at 109. If the appellate court finds error, then "the appellate court must next determine whether the error prejudiced the defendant's due process rights to a fair trial" using the constitutional harmless error inquiry. 305 Kan. at 109.

A prosecutor may not shift the burden of proof to the defendant. *State v. Pribble*, 304 Kan. 824, Syl. ¶ 6, 375 P.3d 966 (2016). But when a defendant attacks the credibility of the State's witnesses by highlighting the State's failure to call corroborating witnesses, the State may respond by noting the defendant's ability to also call witnesses. *State v. Williams*, 299 Kan. 911, 939, 329 P.3d 400 (2014); *State v. Peppers*, 294 Kan. 377, 397, 276 P.3d 148 (2012). "'Such a comment, refuting a purported inference, is not an impermissible shifting of the burden of proof.'" *Williams*, 299 Kan. at 940 (quoting *State v. Naputi*, 293 Kan. 55, 64, 260 P.3d 86 [2011]); see also *Pribble*, 304 Kan. at 838 (no improper burden shifting by commenting on the defendant's failure to call witnesses corroborating his alibi). To determine whether a shift occurs, courts may note whether the State was responding to the defense counsel's argument. *Peppers*, 294 Kan. at 397.

This case is similar to *Williams*. During closing arguments in *Williams*, defense counsel argued the State failed to provide witnesses corroborating the victim's statement; in response, the State noted the defendant could also subpoena witnesses. The Supreme Court held the State's response did not shift the burden of proof; the State responded to explain steps law enforcement had taken to identify those witnesses, not to invoke the defense to disprove the crime's occurrence. 299 Kan. at 941. As in *Williams*, Throne highlighted the absence of corroborating witnesses to attack T.C.'s credibility. Under *Williams*, the State could respond to this argument by noting Throne also had the power to subpoena witnesses.

The State's further comments, however, are on less solid ground. To rebut Throne's argument, the State only needed to highlight his subpoena power. But the State went further, implying Throne would have called witnesses had they been beneficial. This implication, compounded by the State's speculative account as to what information the witnesses may have provided had they been called, gives us pause. While it is true that courts permit the State wide latitude in crafting closing arguments, the State's arguments at least muddied the question as to the burden of proof. At the same time, the

prosecutor immediately sought to clarify this issue, telling the jury that its role was to "look[] at the evidence, the evidence presented" and ask, "did the State, using that evidence, prove its case beyond a reasonable doubt?"

This is a close case. But even if we were to decide that the prosecutor's comments exceeded the bounds of permissible argument, we would not find that error to require reversal of Throne's convictions. We note that both the State and the district court tempered any jury misunderstanding about the burden of proof. The State reiterated that standard multiple times, before and after making the challenged comments. And the court instructed the jury that the State must prove guilt beyond a reasonable doubt. These steps, viewed in light of the evidence submitted at trial—including independent corroborating evidence of T.C.'s account through Throne's multiple explicit communications and Throne's own admissions to the police around the time of the incident in question—lead us to conclude the State has sufficiently demonstrated that there is no reasonable possibility that the alleged prosecutorial error contributed to the jury's verdict in this case. See *Sherman*, 305 Kan. at 109.

5. *Throne has not demonstrated cumulative error.*

In his final argument on appeal, Throne argues that even if his alleged errors do not individually require reversal of his convictions, the accumulation of any deficiencies deprived him of a fair trial. We disagree. Rather, the only potential error Throne has identified concerns the prosecutor's statements during closing argument. But even if those comments crossed the bounds of permissible argument, they were not reversible. Kansas courts have long recognized that a defendant is not entitled to a perfect trial, but to a fair one. *Cruz*, 297 Kan. at 1075. Throne has not shown he was deprived of this right.

Affirmed.